TOWN OF NUTTER FORT *ex rel.* LORETTA WILSON QUEEN, ADMINISTRATRIX *v.* FRANK CORBIN *et al.*

(No. 8552)

Submitted September 7, 1937.   Decided October 26, 1937.

*D. H. Hill Arnold,* for plaintiffs in error.

*Harvey F. Smith* and *Creed S. Simons,* for defendant in error.

MAXWELL, JUDGE:

As Chief of Police of the Town of Nutter Fort in Harrison County in 1934, Frank Corbin was under statutory bond in the penalty of $3500.00 with Maryland Casualty Company as surety. The bond was conditioned for the officer's faithful performance of his official duties and for the payment of any damage that might be done by him in the unlawful or careless use of a revolver or other dangerous weapon.

On November 7, 1934, in Nutter Fort, Corbin, while purporting to act in pursuance of his police duties, shot and killed William W. Wilson.

This action is based on the bond and is prosecuted by Wilson's personal representative against Corbin and his surety for damages for the alleged wrongful death of the decedent. On a jury verdict for $2750.00, in favor of the plaintiff and against the defendants, the trial court rendered judgment. To the judgment the defendants prosecute this writ of error.

March 13, 1934, the council of the town, by order of record, appointed Corbin as Chief of Police to serve from March 16 to March 31, inclusive. Another order was entered by the council March 27, employing Corbin as such officer for the month of April. By a later order, April 10, 1934, Corbin was employed as Police Chief at the salary stated in the order "as long as the council desires his services." The manner and extent of his employment stood thus at the time he killed Wilson.

Corbin's bond was executed by him and his surety March 19, 1934. It was accepted by the council. On the theory that the bond covered only such part of the initial period of employment, March 16 to March 31, as was unexpired when the bond was executed, the defendants assert that there cannot be any liability on the bond for conduct of the officer the following November. This position is grounded on a recital in the bond which limits

the liability to conduct of Corbin "during his term of office, as said Chief of Police." It is urged, in effect, that the word "term" was intended by the parties to apply only to the last twelve days of March.

With this contention of defendants we cannot concur. By a provision of the bond the right is expressly reserved to both the surety and the town to terminate the surety's liability on thirty days' notice. It seems unlikely the parties would have made provision for termination on notice of thirty days if the bond was to be in effect only from March 19 to 31. We are impressed that the "term of office" stated in the bond must be deemed to include the period of Corbin's employment as Chief of Police, within the contemplation, of course, that premiums on the bond for the extended period would be paid. The record does not disclose the time for which there was payment of premiums. We indulge the presumption that if the surety company was, in fact, paid a premium sufficient to cover only the latter days of March, or any other term expiring prior to November 7, 1934, such fact would have been introduced into the record. The most there is in the evidence bearing on the phase of the case pertaining to the period of the bond is the testimony of the town recorder that the records of the municipality do not disclose termination of the bond prior to the homicide.

The fatal event occurred in the home of Enoch Longenette. Wilson and the Longenettes were acquaintances. He lived in the village of Quiet Dell about three miles from their home. In the afternoon of November 7th, while Mrs. Longenette was alone in the home, Wilson, drunk and quarrelsome, went there and demanded that he be admitted. Mrs. Longenette refused to admit him. Later, when a small son of the Longenettes was entering the home on his return from school, Wilson forced himself into the house along with the boy. Mrs. Longenette testified that Wilson then sent the boy away from the house and, brandishing a loaded revolver in her face, threatened her life. Presently, she managed to leave the house, ran to the home of a neighbor and telephoned to Corbin who was at police headquarters and requested him to come at

once to her home and remove the intruder. Corbin came on a motorcycle within four or five minutes. When he reached the Longenette home, she called to him from her retreat to be careful because Wilson was armed. Corbin went into the house through the kitchen door and almost immediately after his entry, he fired from his revolver the shots which killed Wilson. Corbin testified that when he entered the kitchen, he was faced by Wilson standing in the middle of the room with a shot gun aimed at him, and that Wilson seemed to be trying to pull the trigger (later it developed that the trigger was on safety). Corbin further testified that he fired the fatal shots believing it was necessary in order to save his life.

Corbin was indicted for the murder of Wilson and was convicted of voluntary manslaughter. However, this court, on writ of error, reversed the judgment, set aside the verdict and remanded the case for a new trial, because of manifest errors in the record. *State* v. *Corbin*, 117 W. Va. 241, 186 S. E. 179. Though, with propriety, there was recital of details of testimony in the opinion cited, it is not necessary for purposes now at hand that there be minute discussion of the evidence.

Was Corbin acting rightfully—within his province as Chief of Police of the town—in entering the Longenette home and attempting to place Wilson under arrest? We answer in the affirmative.

A home is of the most sacred of human institutions. The wanton intrusion of a home strikes at the basis of society. It would be difficult to conceive of a more important duty of a police officer than to respond promptly and vigorously to a housewife's alarming call, in the absence of her husband, that her home was being invaded by a drunken man threatening her with violence. May the time not come when such summons will fail to bring speedy and unapologetic action on the part of custodians of the peace.

Corbin's response to Mrs. Longenette's summons was clearly in the line of his official responsibility. Failure by him to go at once to her home would have been a serious dereliction.

Wilson, as an intruder in the Longenette home, if not in fact guilty of a felony under the unlawful entry statute (Code 61-3-11), was clearly guilty of plainly misdemeanorous conduct involving breach of the peace. In either aspect the policeman had authority to arrest Wilson without a warrant, because a breach of the peace was transpiring in the officer's presence. Therefore Corbin, being lawfully there and having full right to act without warrant, was confronted with the duty of making the arrest of Wilson and removing him from the Longenette home. Whether it would have been more discreet, and safer for both himself and Wilson, if Corbin had summoned assistance is a matter which need not now be considered. He elected to proceed single-handed. This, he had a right to do.

Having, in regular manner, entered the Longenette home in lawful discharge of his public duty, what was Corbin to do when he found himself confronted by an acute emergency? He might have withdrawn, but he certainly was under no obligation to do so. Officers do not often retreat. Even a person in private life, who reasonably believes himself in imminent peril because of an attack unprovoked by him, is not required to retreat from an assailant before shooting, because such retreat might in itself accentuate the danger. Much the less is an officer, attempting to make a lawful arrest, required to retreat before shooting or striking a fatal blow in his own defense where appearances justify his fear of suffering serious injury or loss of life.

An officer is not justified in shooting a fleeing misdemeanant in order to make an arrest. *City of Princeton ex rel. Barber* v. *Fidelity & Casualty Co.*, 118 W. Va. 89, 188 S. E. 757. But where there is no flight and the misdemeanant threatens violence against the officer, the latter, in pressing forward to make the arrest, may repel force by force in order to defend himself from serious bodily injury or loss of life, even to the extent of taking the life of the offender. This is the simple principle of self-defense as applied to police officers. *State* v. *Murphy*, 106 W. Va. 216, 145 S. E. 275; *State* v. *Stockton*, 97 W. Va. 46, 124 S. E. 509; *State* v. *Dunning*, 177 N. C. 559,

98 S. E. 530, 3 A. L. R. 1166; *Hammond* v. *State*, 147 Ala. 79, 41 So. 761; *Loveless* v. *Hardy*, 201 Ala. 605, 79 So. 37; 4 Am. Jur., Arrest, section 78; 1 Michie on Homicide, section 105. However, the officer, just as a private individual who relies on self-defense, acts subject to the possible appraisal of a jury whether excessive force was employed by him. *Thompson* v. *Norfolk Railway Co.*, 116 W. Va. 705, 182 S. E. 880; *State* v. *Smith*, 127 Iowa 534, 103 N. W. 944, 70 L. R. A. 246, 109 Am. St. Rep. 402, 4 Ann. Cas. 758.

The law does not impose on conservators of the peace the dangerous responsibility of making arrests however vigorous the resistance, without at the same time recognizing that such officials have the right of self-defense. The duty and the right are concomitants. The latter is complementary to the first.

Whether Corbin was justified in shooting Wilson is a jury question, but the jury which sat in the trial under review was in no position fairly to adjudge that matter in the absence of proper instructions on the officer's duty to make the arrest and his right to defend himself when he entered the Longenette home.

These observations respecting fundamental law necessitate our disapproval of the trial court's refusal of defendants' instructions Numbers Five and Ten. The fundamental proposition of the duty of an officer to press forward to make an arrest and his right to defend himself while doing so is fairly presented by Number Five. No instruction which was given to the jury dealt with the double aspect of this principle. Number Ten states correctly the right of self-defense and applies it to the case at hand. Defense instruction Number Three, given, touches upon the same matter, but not so fully as Number Ten. In our opinion, the refusal of these two instructions necessarily involved serious prejudice to the defendants.

Other assigned points of error we deem inconsequential.

For the reasons set forth, we reverse the judgment of the trial court, set aside the verdict and remand the case for a new trial.

*Reversed; remanded.*