State of West Virginia *v.* Hobart Gunter

(No. 9165)

Submitted September 9, 1941. Decided October 14, 1941.

*Walter G. Burton* and *Sanders & Day,* for plaintiff in error.

*Clarence W. Meadows,* Attorney General, *Kenneth E. Hines,* Assistant Attorney General, and *R. D. Bailey,* for defendant in error.

Kenna, President:

Hobart Gunter was convicted of murder in the second degree and the Circuit Court of Wyoming County, by an order entered July 23, 1940, sentenced him to confinement in the penitentiary for the indeterminate term as pro-

vided by law for murder in the second degree. There are six grounds of assigned error, the first of which is that the verdict is contrary to the law and the evidence in that there is no showing of fact that would uphold a finding that the killing was done maliciously. Since the testimony concerning the actual occurrence is in irreconcilable conflict, it is probably better to recount first the admitted incidents leading up to the violent death of William Leslie Pack at Oceana at about nine-thirty on Saturday evening, October 28, 1939.

Pack was a young man in his early twenties, and on the afternoon of October twenty-seventh, which was Friday, he had gone with his friend, Thomas R. McBride, in Pack's five-passenger automobile from his home at Mullens to Beckley for the purpose of seeing a football game. Spending Friday night at Pack's home, they got up around nine-thirty Saturday morning, went down town in Mullens in Pack's car, and at about twelve o'clock noon, met Leman Rose and Ed Sizemore at the "Sandwich Shop." Rose had about a half pint of liquor. The four drank this half pint in Mullens where they purchased another pint before leaving for Pineville. On the way to Pineville they stopped, pulled off the road and took a drink of liquor. In Pineville, they bought another pint of liquor. When they left Pineville, they drove to Oceana and from there they went to Cyclone to see a young woman by the name of Mabel Brown whom they got to go with them to Mann at around four-thirty in the afternoon. McBride, Rose and Sizemore drank a bottle of beer, leaving Mann at about six o'clock and returning to "Jimmie's Place" in Oceana Junction, where they ate, drank soft drinks, and danced in a skating rink connected with the restaurant until in the neighborhood of nine o'clock. They then decided to drive to Beckley. Pack thought that the gas tank of his car was practically empty, and since they did not sell gas at "Jimmie's Place," but did sell it at a place directly across the road called "Sally's Place," or "The Dirty Shame," he got into the car, turned it around and stopped within range of the pump for the purpose of having the tank filled. There

being no response to his summons of an attendant, Pack left the car and started into the building known as "Sally's Place."

Apparently Gunter arrived at "Sally's Place" just a little time before Pack and those accompanying him at "Jimmie's Place" came across the road for the purpose of buying gasoline. Gunter was a constable in Center District of Wyoming County, having been elected in 1938, a little less than a year before the death of Pack. On Saturday evening, he came to Oceana with a friend of his named S. A. Webb for the purpose of serving several warrants and collecting costs owed the justice with whose office Gunter was connected. At the time or shortly after they arrived at "Sally's Place," Webb left the car for the purpose of getting something to eat in the restaurant, and as he got out, a young woman nicknamed "Blackie" got into the front seat with Gunter. A little later, Gunter's attention was attracted, he says, by a staggering man who was evidently resisting the request of his woman companion who had hold of his arm. The man was Rufus Williams, a coal miner who lived at Kopperston. Gunter got out of his car for the purpose of arresting Williams for being intoxicated in a public place.

Pack getting out of his car to summon an attendant and Gunter leaving his for the purpose of making an arrest were very nearly coincidental.

The man whom Gunter left his car to arrest had left his home with his wife and his two fourteen-year old sons at approximately seven-thirty. Rufus Williams had drunk three bottles of beer and had taken nothing alcoholic since leaving home. He, his wife and his two boys state positively that he was not intoxicated.

Necessarily, time is not dealt with in any degree of exactness but the hour at which young Pack, Gunter and the Williamses were on the ground around Sally's restaurant is not a significant factor, and the witnesses are in practical agreement that it was likely between nine and nine-thirty. As to the occurrences which followed, witnesses who testified on behalf of the state and those that testified on behalf of the defendant are in direct and

irreconcilable conflict, so that it can almost be said that the verdict rests upon the determination of credibility on the part of the jury. The theory of the defense, substantiated fully by the testimony of Gunter and Rose and in part by the testimony of Webb and Napier, is that when Gunter was arresting Williams and had taken hold of one of his arms while Mrs. Williams was pulling him away by the other arm, Pack approached Gunter from behind and, unseen by him and without provocation, struck him with an unidentified bludgeon at the right base of the skull, knocking him to his knees and dazing him almost into unconsciousness. Gunter drew his gun from its holster, scrambled to his feet, wheeled so that he faced Pack, and, without the intention of firing it, but for the purpose of using it as a club, brought his pistol down with an overhand blow so that it was accidently discharged when leveled at the center of Pack's forehead.

On the other hand, the testimony of McBride, Mabel Brown, Mr. and Mrs. Williams, the two Williams boys and one other, is to the effect that when Gunter left his car and attempted to arrest Williams, he was asked to show his badge or exhibit a warrant or to state for what reason he was making the arrest. This he declined to do, and Williams being unwilling to accompany him, struck Williams in the face with his fist, some witnesses say once and others twice. At this juncture, Pack approached in plain view and undertook to remonstrate with Gunter by saying "You can't do that to him where I am and get by with it," or "You can't treat a friend like that," the witnesses not being in entire agreement as to the words used. The state's witnesses state positively that Pack offered Gunter no physical violence nor used any abusive language.

Gunter turned on Pack, leveled his gun and, with the comment "Keep your chip out of my business," fired.

Mabel Brown watched the occurrence from the front seat of Pack's car, and upon seeing him shot, at once got out for the purpose of being of assistance to him. She states that she then heard Gunter say that he would not have shot Pack "if he hadn't hit me." She then called

Gunter a dirty liar and told him that Pack had not touched him.

There were two members of the Department of Public Safety cruising that evening in the neighborhood of Oceana. They passed "Sally's Place" a little before the shooting occurred, and returned a few minutes after. They encountered Gunter as he was coming out of the beer parlor at "The Dirty Shame," disarmed him and placed him under arrest. Pack's body had not been removed, and Gunter apparently was taking no interest in it. The officers asked Gunter why he shot the boy, and his response was that they "was ganging" him.

A day or two later, in the presence of one of the officers, Gunter had changed his version of the occurrence, and stated positively that the shooting was accidental.

The defendant's brief assigns six errors of the trial court, the last three of which can be briefly disposed of.

Assignment "F" is that the trial court erroneously declined to permit the defendant to show by the circuit clerk that the father of young Pack had been appointed administrator of his estate and had brought a damage suit for the alleged wrongful death of his decedent which was pending at the time of Gunter's trial, treating the fact that the father had assisted in preparing the prosecution by interviewing witnesses and possibly influencing their testimony, as bearing upon their credibility. We think it is quite clear that while the statement that such an action was pending might have been made with propriety by any witness who knew that such was the case, it is plainly a collateral matter if at all relevant, and that declining to admit the testimony of the clerk of the circuit court was plainly not erroneous.

Assignment of error "E" is that R. D. Platt, a member of the Department of Public Safety, was permitted to testify over the defendant's objection that Mabel Brown had told him she had witnessed the killing. In so far as this record is concerned, it may be said that it is an uncontroverted fact that Mabel Brown actually did witness the killing. Consequently, on the face of this record, although the testimony was undoubtedly hearsay, it is ap-

parent that any resulting error was plainly non-prejudicial.

The fourth assignment of error has to do with the jury viewing the place where the killing took place, and whether the manner in which that was done violated the provisions of Code, 62-3-6, requiring juries in felony cases to be kept together. After the state's proof was in, upon motion of the prosecuting attorney, the jury was sent to the scene of the shooting in three automobiles with a deputy sheriff in each car, the deputy remaining with the same four jurors in the same car on the return trip. It does not appear that the defendant's attorney objected at the time to the manner in which the jury was conducted to the scene, or to the deputy sheriffs who accompanied the jury. The attorneys for the defendant went to the scene with the jury and upon their return, made a general objection accompanied by a motion to discharge the jury and continue the case. No conduct on the part of any juror nor on the part of any deputy sheriff formed the basis of the objection or motion. The trial judge in acting upon the motion examined all three of the deputy sheriffs under oath, and reached the conclusion that, although there had been a separation of the jury, the state had carried the burden which devolved upon it to show beyond any reasonable doubt that the separation had been the occasion of no improper conduct by a member of the jury or of any improper approach of a member of the jury by another person. We are under the impression that it rested upon the defendant to show by cross-examination of the deputies in charge of the jury or otherwise that improper conduct by or toward some member of the jury had occurred.

Dealing with the remaining three assignments of error as they are arranged in defendant's brief, the first has to do with the insufficiency of the state's evidence, and this question in turn rests mainly upon the showing of malice. Actual malice arises from a showing of malignancy. It would seem to be a mental attitude, the method of proving which cannot be definitely prescribed. Legal malice depends upon intentional conduct. It may be inferred

from a purposeful and unjustifiable killing with a deadly weapon, and, although a jury in reaching its conclusion as to the existence of malice should consider, and undoubtedly would be influenced by, the fact that the accused is a peace officer and for that reason his lawful use of a deadly weapon is more likely than its lawful use by another, we do not believe that there is any fixed presumption arising from the fact that the weapon inflicting the wound in question was in the hands of an officer. Here, the reason for the use of the gun was the principal question submitted to the jury. The state's testimony shows a killing without provocation and without justification. It is not controverted that Gunter was lawfully entitled to carry a pistol, and as an officer of the law to make proper use of it. However, the question here was submitted to the jury as to whether Gunter had gone plainly beyond the scope of his official duty in the use of his gun and the consequential death of Pack. The verdict of the jury found that, under all the circumstances shown by the testimony, he had, and we are of the opinion that that verdict, according to the showing of this record, had sufficient proof to sustain it. *State* v. *Bowles,* 117 W. Va. 217, 220; 185 S. E. 205, and cases there cited.

The next assignment of error has to do with the state's instructions two, four, five, six and twelve. In considering the propriety of these instructions, the fact that Gunter was indicted for murder in the first degree and that the verdict found him guilty of murder in the second degree, although having no bearing upon the correctness or incorrectness of the state's instructions complained of in this assignment of error, of course, has a direct bearing upon the question of whether any error so committed would result in prejudice to the accused. An examination of the instructions complained of discloses that each of them deals with a wilful, deliberate and premeditated killing, or, in other words, with murder in the first degree. Under our West Virginia cases, that phase of the proof was disregarded by the jury and that being so the foundation upon which these instructions rested having, in effect, been found by the jury to be non-existent, it is .

quite evident that their findings was not influenced by instructions based upon evidence that they plainly regarded as insufficient. See the discussion and cases cited in *State* v. *Bowles*, 117 W. Va. 217, 185 S. E. 205.

There are other objections to these same instructions which are so plainly predicated upon the defendant's theory of the whole evidence and in such utter disregard of the contention and evidence of the state, that their discussion would involve a detailed statement of testimony rather than a principle of law. It is, of course, rudimentary that upon the submission of an issue of fact to a jury, both sides of the controversy are entitled to have the court instruct the jury to return a verdict based upon the admitted circumstances and upon any theory of fact that there is substantial evidence to support. If there were no conflicting testimony, a verdict for the state contrary to the proof would be set aside by the trial court, and, in a civil action, there would be no issue that need be submitted to the jury.

The third assignment of error has to do only with the trial court's refusal to give defendant's instruction No. 3, which told the jury not to return a verdict of guilty of second degree murder. The only questions raised by this instruction are those raised by the first assignment of error, which has been fully discussed, and since it has been held to be untenable, the same result naturally follows in so far as the third assignment of error is concerned.

We have examined this record carefully with the result that we are of the opinion that it discloses no prejudicial error of law committed by the Circuit Court of Wyoming County. There was an unusually abrupt issue of fact, and aside from the inferences to be drawn from the testimony concerning malice, we are under the impression that the question of credibility was all the jury had to determine. True, they were told in one of the state's instructions that "if they believed" certain facts they should make a certain finding, without mentioning the evidence as the reason for their belief. However, the jury was given twenty-five instructions at the request of

the defendant, and ten instructions on behalf of the state, most of which plainly told the jury that if they believed certain things "from the evidence" they should reach a stated conclusion. Instructions are to be taken and read as a whole, and if that is done here we are clearly of the opinion that the omission of the words "from the evidence" in this one instruction is obviously not misleading. As this case went to the jury, what took place was either an accidental killing or a plainly brutal attack. We are of the opinion that the record before us shows no apparent reason to disturb their finding.

*Affirmed.*