STATE OF WEST VIRGINIA

*v.*

NOAH TOLER

(No. 9835)

Submitted September 25, 1946. Decided October 8, 1946.

*Wade H. Bronson, Jr.,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, *Eston B. Stephenson,* Special Assistant Attorney General, and *Ralph M. Hiner,* Assistant Attorney General, for defendant in error.

FOX, JUDGE:

On the second day of October, 1945, the defendant, Noah Toler, shot and killed one Johnny Abbott in Mingo County. Toler was indicted, in the circuit court of said county, for murder of the first degree, was tried on that charge, and convicted of murder of the second degree. His motion to set aside the verdict of the jury was overruled and judgment was entered, by which he was sentenced to a term of imprisonment in the penitentiary. To that judgement we granted this writ of error.

There are no substantial contradictions in the testimony as to what occurred at the time of the homicide, but such as they are will be pointed out in the course of this opinion. The principal witness for the State was

Mrs. Howard Cook, who lived about sixty feet from the house where the homicide occurred, which house was occupied by Nora Henderson and two of her brothers, one of whom is the defendant. From her testimony we gather the following:

Four persons were present at some time during the events leading up to the homicide, and at the time of its consummation. They were Nora Henderson, Noah Toler, Norris Cook, sometimes called "Nig" Cook, and Johnny Abbott, the deceased. The difficulty began when Nig Cook and Abbott, who were seated in an automobile parked at the side of the Henderson house, were about to leave that point, when Nora Henderson came near the place where the automobile was parked but inside the fence inclosing her premises, and told them not to start the car, and that if they did she would break the glass with a rock. Someone endeavored to start the motor of the automobile and Nora Henderson threw something, and there was a breaking of glass. One of the men in the automobile stepped out, and Nora then came outside her lot, after being told by one of the men, "Well, if you want to come out, come on and if Noah wants to take it up bring him with you", and went to the automobile door, opened it, and asked Cook to come out; whereupon, both men stepped out of the automobile. Nora Henderson and Abbott then began trying to fight; Nora asked Abbott not to come inside the fence; and Abbott then asked Cook to go in with him. Cook and Nora Henderson then went into the house, and after they had closed the door, Abbott also went into the house. Soon after Abbott entered the house a man, afterwards identified as the defendant, Noah Toler, left the house and went down an alley. After Toler left the house, Nora Henderson and Abbott resumed their altercation, and, according to Mrs. Cook, Nora Henderson told Abbott that "Noah has gone to get a gun", and said that when he came back he would shoot him. A quarrel then began over a flashlight owned by another brother of Nora Henderson, one Isaac Toler. At this point Nora went into another room of her house, out of sight of the witness, Mrs. Cook. After she had left

the room, Abbott went into the kitchen, pulled out a drawer in a table, and then closed it. What he did there the witness could not state, but other witnesses say that, at that time, he removed a butcher knife therefrom. Nora Henderson then came back into the room and asked Abbott to leave the house, and again told him that Noah Toler had gone to get a gun and that he would shoot him; she told him that she and Cook would walk out with him. Mrs. Cook's attention was then distracted by a passing train, and her view cut off by the closing of a door. She then went into the living-room of her home, where she was standing by a window, when she says she saw a man coming through the alley leading to the Henderson home, walking very fast. He opened the gate, went up on the porch of the Henderson house, and at that time the door of the house opened. She says that it seemed to her that all of the parties met at the door; and there was some loud talking, but the only words she could distinguish were "stand back"; that immediately she went to the door of her house, and just as she started to step out on the porch, she heard the gun fire, and saw its flash, and saw a man fall; a man then came off the porch, came out close to the gate and stopped, then opened the gate and started running up the road "real fast"; Nora Henderson and Cook then came outside the gate, and when the witness inquired of them what had happened, Nora Henderson told her that Noah had shot Johnny. It seems clear from all the testimony that there was considerable drinking during the evening, especially by Nora Henderson and Abbott. The evidence is that these two people had formerly been friends, and that Abbott had lived at the Henderson home at times for some two or three years, except for the two or three-months period immediately prior to the homicide.

The testimony of Nora Henderson does not conflict with that of Mrs. Cook, except that she denies that she made the statements that Noah Toler had gone to get a gun and that he would shoot Abbott. She also says that she heard Abbott say that he would "cut his [Noah's] guts out"; but does not say that this state-

ment was made in Noah's presence; and also stated that defendant backed up to the edge of the porch before he fired his gun; that he loaded the gun while he was backing up. She says that Abbott was drinking and that she tried to get him to leave the house.

Nora Henderson is corroborated in her testimony by Norris Cook, sometimes referred to as "Nig", except that he says he did not hear Abbott say that he would cut Noah's guts out. He says that when defendant returned, Abbott took several steps toward him. It appears that a knife was found on the body of Abbott after he was shot, but Cook says he did not see the knife prior to the homicide. He does say that Abbott had the knife on his person, and that he saw him put it in his pocket about ten minutes before the homicide, and says that Abbott said he would defend himself. He testified that: "They had all been in a racket", and that "Toler had told him [Abbott] to shut up", and that this was "before he got the gun"; that defendant left the house and was gone about thirty minutes, but that he did not know he had gone to get a gun.

Noah Toler testified as follows: "I come up the road, come from the sawmill up to the house. I got up on the porch and got up in about two foot of the door. This man was quarreling with my sister. I said why don't you hush that argument. He said 'It ain't nothing to you. It ain't none of your business. If you want to take it up, I'll cut your guts out'. He started walking towards me, and I said 'Stand back, Johnny.' I asked him to stop. He kept on coming. I got as far back without turning to see the steps. I got as far back as I could without falling. I had to shoot with the gun at my side in my hands. If I had got it to my shoulder, all he would have to do was knock it out of my hand and cut me." He says Abbott's right hand was in his front pocket and that his left hand was under his overall bib at the time he was coming toward him. He admits he did not see a knife, but says, "I didn't know what he aimed to pull", and that he expected that he would carry out his threat, and that he thought he was in danger of serious bodily harm,

at the time he fired the shot which resulted in the death of Abbott. He also says that when he left the house that evening his sister was endeavoring to get Abbott to leave. When asked as to whether he knew Abbott was a dangerous man, he said, "Nothing only to cut you", and then stated that Abbott had cut a hole in the top of George Belcher's hat, and that he knew of him saying that he would use his knife on another occasion. He explained his possession of the gun by saying that he had gone down to his brother's home, and when he decided to return home, he told his brother, "I am going home. I am going to take the gun and shells. Tell P. J. Harless I want to go squirrel hunting tomorrow"; and that he went to the sawmill and got the gun, and that at the time he figured that Abbott had left the Nora Henderson house.

Considered in its entirety, the evidence establishes these facts: There was considerable drinking, though the defendant is not connected therewith; Nora Henderson and Abbott were quarrelling and attempting to fight; Nora Henderson was trying to get Abbott to leave her house, and in this she was supported by Noah Toler. While this quarrelling was in progress, Noah Toler left the house and returned in about thirty minutes, or possibly a little longer, with a gun; when he returned, Abbott was still at the Henderson home; and when he stepped on the porch of that home he was met by Abbott, Nora Henderson and Nig Cook. This meeting was at the door and there was loud talking, a command to "stand back", immediately followed by the fatal shot. On all of these facts the jury returned a verdict against the defendant of murder of the second degree, a verdict which we think is justified by the evidence.

The State offered one instruction, which the court gave. It was the usual instruction which told the jury that it could find one of five verdicts: (1) Murder of the first degree; (2) murder of the second degree; (3) voluntary manslaughter; (4) involuntary manslaughter; and (5) not guilty. The instruction proceeded to define

these several crimes and to set forth the punishment prescribed for each. It was the customary instruction given in murder cases. The only question is whether, under the facts and in the circumstances of this case, there should have been an instruction covering murder either of the first or second degree. We think our authorities support the proposition that where there is evidence tending, in a reasonable degree, to support any theory upon which a conviction is sought, an instruction on such theory is not erroneous. In *State v. Clifford*, 59 W. Va. 1, 18, 52 S. E. 981, this Court said: "It is enough that there is evidence appreciably tending to prove or establish a certain theory of a case, however slight the degree of its weight. And a court need not withhold an instruction for paucity of evidence, if there be any, tending, in any appreciable degree to establish the hypothesis embodied in the instruction." But be this as it may, the defendant was not found guilty of murder of the first degree, and, therefore, even if the instruction on the theory of first degree murder was improper, the defendant was not prejudiced thereby. It has often been held by this Court that where a conviction is had for second degree murder, or some lower offense, the fact that an instruction has been given on the theory of first degree murder, even though erroneous, is immaterial. *State v. Johnson*, 108 W. Va. 630, 152 S. E. 203; *State v. Bowles*, 117 W. Va. 217, 185 S. E. 205; *State v. Gunter*, 123 W. Va. 569, 17 S. E. 2d 46; *State v. McLane*, 126 W. Va. 219, 27 S. E. 2d 604; *State v. Jones*, 128 W. Va. 496, 37 S. E. 2d 103. We do not think the giving of instruction No. 1 was erroneous, even as to the feature supporting the theory of murder of the first degree, and there was evidence which warranted a verdict of murder of the second degree, and, therefore, the instruction on that theory was manifestly proper. The jury had the right to infer malice on the part of defendant, because the homicide was committed with a deadly weapon. *State v. Bowles, supra; State v. Jones, supra.* True, the defendant relies upon self-defense, and particularly upon self-defense connected with the fact that he was in his own home, and, under our authorities was

not required to retreat if an attack was made upon him, or if the situation at the time was such that he had the right to believe, and did believe, he was in danger of death or great bodily harm. However, in protecting himself from what to him was apparent danger, he assumed the risk. *State* v. *DeBoard*, 119 W. Va. 396, 194 S. E. 349. Mere words of threat, unaccompanied by an overt act, do not constitute justification for homicide under the law of self-defense, and any apparent danger must exist at the time the act of defense is committed. *State* v. *Snider*, 81 W. Va. 522, 94 S. E. 981; *State* v. *McMillion*, 104 W. Va. 1, 138 S. E. 732.

It is peculiarly within the province of the jury to weigh the evidence in criminal cases, and every element thereof, including that of self-defense. The verdict of the jury in a criminal case will not be set aside unless it is manifestly against the weight of the evidence, and it will not be set aside merely because there are conflicts in the evidence. A multitude of cases which sustain these propositions could be cited, but the following will suffice: *State* v. *McMillion, supra; State* v. *Magdich*, 105 W. Va. 585, 143 S. E. 348; *State* v. *Hamrick*, 112 W. Va. 157, 163 S. E. 868; *State* v. *Bowles, supra; State* v. *De-Board, supra;* and *State* v. *Gunter, supra.*

The defendant offered twenty instructions, of which the court gave twelve and refused eight. So far as we can observe, the jury was instructed on every point affecting the defendant's rights. Of the instructions refused, No. 1 was a peremptory instruction, instructing the jury to find the defendant not guilty. No. 7, refused, dealt with the statement alleged to have been made by Abbott that he would cut defendant's guts out. This statement was dealt with in defendant's instruction No. 18, which was given. Instruction No. 8, refused, was on the point that defendant had a right to stand his ground, and this, we think, was fully covered by other instructions, particularly instruction No. 15, which was given. Instruction No. 11, which would have told the jury that the evidence of unfriendly witnesses should be scanned

with caution, was properly refused because it did not appear in the trial that any hostile witnesses testified. Defendant's instruction No. 13, refused, was completely covered by instruction No. 15. Instruction No. 16 refers to a person's rights and privileges in his own home, and instruction No. 15, given, deals with the same right. Both instructions Nos. 17 and 19, refused, refer to the alleged statement that Abbott threatened to cut Toler's guts out, and this alleged statement is referred to in defendant's instruction No. 18. Defendant's instruction No. 6, as modified by the court, was given and reads:

> "The Court instructs the jury that when a person without fault himself is assaulted and reasonably apprehends that his assailant will do him bodily harm, he has the right to repel the assault by all force he deems necessary, and is not compelled to retreat from his assailant, but may in turn become the assailant, inflicting bodily wounds until his person is out of danger, so if you believe from the evidence in this case that Johnny Abbott, armed with a knife, advanced toward him and that Toler believed that Abbott would kill him, or do him some bodily harm, then Toler was justified in defending himself with a fire arm, even to the point of killing Abbott, and you must find the defendant not guilty, but he acted at his peril as the jury must pass on his actions in the premises, and if the jury should find he acted on honest motives and reasonable convictions, then he was justified, otherwise, he was not."

We think this instruction correctly and fully covers the law of self-defense.

On the whole, we are of opinion that defendant was given a fair trial, and while the case has some elements sustaining the theory that the homicide was committed in the exercise of the right of self-defense, there is other testimony from which it might be concluded that there was malice and even premeditation and deliberation. The fact that defendant, after the beginning of the quarrel between Nora Henderson and Abbott, in which to some degree he participated, left his home, and, according to some evidence, Nora Henderson believed he had gone to get a gun and that, on his return, he would shoot

584

Abbott, coupled with the fact that within a short time thereafter he did return to his home, and at the first opportunity did shoot him, affords such support for the verdict as precludes a finding by us that it was plainly wrong.

The judgment of the Circuit Court of Mingo County is affirmed.

*Affirmed.*