76 S.E.2d 906 (1953)
STATE
v.
STALNAKER.
No. 10514.
Supreme Court of Appeals of West Virginia.
Submitted January 27, 1953.
Decided February 10, 1953.
Dissenting Opinion July 30, 1953.
*907 Wysong & Wysong, Webster Springs, for plaintiff in error.
John G. Fox, Atty. Gen., and Thomas J. Gillooly, Asst. Atty. Gen., for defendant in error.
RILEY, Judge.
Wayne Stalnaker, a member of the law enforcement division of the Conservation Commission of West Virginia, was indicted in the Circuit Court of Gilmer County for the malicious and unlawful wounding of Okey L. Davis; and was found not guilty of the charge of malicious wounding, but was convicted of the unlawful wounding *908 charged in the indictment and sentenced to ten months' confinement in the Gilmer County jail and fined one hundred dollars.
The defendant, Wayne Stalnaker, one of the law enforcement officers of the conservation commission, was assigned to the Counties of Barbour, Randolph, Upshur, Tucker, Lewis, Harrison, Tyler, Gilmer and Doddridge. He had had the position of chief law enforcement officer for the conservation commission for fifteen years.
Clay Miller, the conservation officer for Gilmer County, whose duties consisted of the protection of game, fish, wild life and the forests, received a report of numerous game violations in the vicinity of the prosecuting witness' farm in Gilmer County. Miller sought assistance from R. V. Thompson, the conservation officer for Lewis County, and went to Weston, where he conferred with the latter. Miller having reported to his superior, Stalnaker, the conditions in Gilmer County, the defendant ordered Thompson to accompany him to that county for the purpose of rendering whatever official assistance was required by Miller in the enforcement of the conservation laws in that county. Pursuant to arrangement, the three officers, Stalnaker, Miller and Thompson, about four-thirty in the afternoon of September 23, 1951, proceeded by automobile to a point on Leading Creek in Gilmer County, near the farm and residence of the prosecuting witness, Okey L. Davis, at which place the automobile was parked. The officers, having heard a shot in a general direction downstream of the creek near which they were standing, proceeded in that direction for the purpose of investigating the source thereof. A short time later, and in the same direction, they heard three more shots on the Davis farm, making in all four shots. Defendant and Thompson then went toward and on defendant's farm to investigate "the source of these shots", and conservation officer Miller remained behind. Stalnaker and Thompson went on the land below an orchard, and Stalnaker, walking ahead, while Thompson tarried at an undisclosed point for fifteen or thirty minutes, came to the edge of the woods above the orchard, where he heard a noise in the woods. Looking up he saw Davis, who, defendant testified, was carrying a gun, either a rifle or shotgun. At that time Stalnaker, wearing his regulation uniform and armed with a thirty-eight caliber pistol, "cut back" below a wire fence. Defendant then heard Davis, or the same person he had seen before, say, "Where did them damned game wardens go?" Davis, having proceeded under the wire fence, the two persons approached each other. Defendant testified that Davis, addressing him in vile language, told him to "get off of here before I kill you"; that Davis then attacked defendant with "some kind of an instrument", which he identified as a hammer, and which was produced in evidence at the trial. Defendant further testified: "And he made at me with some kind of an instrument which proved later to be a hammer, which I have here. We had quite a round there, and he knocked my glasses off and broke them. He hit me a couple of licks over the head with this hammer, Mr. Wysong, so then we got down in somewhat of a scrimmage and we got down on the ground. During the scuffle these strapsI don't know if the people are familiar with themwe call `lanyards', these straps that go around the shoulder to hold the pistol. Mr. Davis had hold of that lanyard on the ground and he jerked the pistol out of the holster, and I grabbed the pistol, and when I grabbed the pistol to put it up why he kicked my arm, which caused the pistol to be discharged, and the dirt flew up just a short distance from where we were laying."
According to Stalnaker at the time the pistol was fired, and while he was lying upon Davis, he had the latter's right leg pinned to the ground in such way that it was covered by defendant's body.
In the main Stalnaker's testimony is corroborated by that of conservation officer R. V. Thompson, who, together with defendant and the prosecuting witness Davis, were the only eyewitnesses to the entire altercation. Thompson testified that after entering Davis' land, defendant and he walked in a field back of Davis' house, and, having reached the top of the hill back of the house, he stopped and sat down for fifteen or thirty minutes, while defendant went *909 around the hill, disappearing from view. After a while defendant came back around the hill toward witness, and at defendant's direction Thompson proceeded to the left into the woods, and Stalnaker went in the opposite direction. After travelling through the woods for some distance, "two or 300 yards probably", Thompson heard two people yelling back and forth to each other, evidently some distance apart. Thereupon, Thompson started to run back toward the field, coming into the orchard on the other side of the hill, where he heard voices fairly close to him and someone say, "Get out of here you ____, I will kill you." Turning in the direction of the voices, he saw defendant stagger out backwards from behind some brush and, running over to the wire fence, observed defendant running toward the prosecuting witness, swinging his hands at him. Thompson climbed through the fence, and by that time defendant and Davis had clinched. Just as he got over the fence, Thompson saw Davis and Stalnaker on the ground, about thirty feet away. As he proceeded toward the two men, Thompson saw Stalnaker's pistol fall to the ground and defendant retrieve it. This witness further testified: "Mr. Davis had hold of the lanyard, the strap that fastened to the part of the gun, and they thrashed around there for juston the ground Mr. Davis' foot hit Stalnaker on the arm and the gun went off. That bullet struck the ground in front of me there about 5 feet from the muzzle of the gun"; and at the time the gun was fired Davis' right leg was under Stalnaker's body.
That prior to being forced to the ground by Stalnaker's onslaught, the prosecuting witness struck defendant over the head with a small hammer, which he was carrying, as he came down the hill in the direction of the two officers, is established beyond peradventure by this record. The uniform, which Stalnaker wore at the time of the encounter between the two men, was introduced in evidence, and furnishes mute evidence from the bloodstains thereon that wounds on defendant's head caused him to bleed profusely, blood running down over his face on the front of his uniform, and also running down his neck and back from the top of his head on the back of his uniform.
On the other hand Davis in his testimony for the State, which in a number of details is at variance with defendant's and Thompson's testimony, testified that he went into the woods above his residence with a small hammer and some roofing tacks, carrying them in a gas mask for the purpose of posting his lands; that when he came to the end of an orchard below and contiguous to the woods and climbed over a fence separating the woods from his pasture fields, he saw Stalnaker on his left, coming around a bunch of cherry trees, which stood on a corner of the meadow by a gap which enters the orchard, wearing his regulation uniform as a conservation officer, and carrying a revolver in his right hand; that when witness saw Stalnaker with his gun, he called defendant a degrading and insulting name, saying, "you got nothing on me this time. This farm is posted from one end to the other"; that witness then walked toward the break of the hill, where he could see his wife and child over the hillside; and that he then proceeded down the hill, where the two men came together. Witness testified that defendant then struck at him "with his hand"; and witness then hit "at him with my hammer"; that when witness struck at defendant with his hammer, the latter threw up his left hand and warded off the blow; and that thereupon defendant shoved witness backwards to the ground. Davis further testified that when he got up defendant spoke for the first time, saying "Where have you been?"; and upon being told that he had been out on the ridge putting up posters, defendant told witness he had seen him at the end of the orchard with a gun, to which witness testified he replied, "You are a damn liar. You never seen me out there in the orchard with no gun. I didn't have no gun out there"; whereupon defendant held out his gun in a trembling hand, and, addressing a vile epithet to witness, said, "I ought to shoot you", to which witness replied, "Go ahead, you ____, shoot, shoot"; that then defendant hit witness with his left hand, evidently knocking him down, and on his knees straddled the witness, *910 who, having, so witness testified, released his right leg from the grip of defendant's left hand, undertook to pull that leg up in an endeavor to shove defendant off him "and then's where he shot me underneath there in the leader, and I rolled over." Further narrating his version of what happened at the time Davis claims he was shot by Stalnaker, he testified that defendant arose, and permitted witness to rise from the ground; that immediately upon arising he saw his young son and another boy standing thirty or thirty-five feet away; and that looking down the hill to see what had happened to his wife, saw her lying on the ground near a walnut tree, she evidently having fainted from shock in the belief that her husband had been killed, and glancing to the left witness then saw Thompson near the end of the orchard. When Thompson reached the scene of the altercation, he or Stalnaker searched the gas mask which Davis was carrying, when he came down the hill toward defendant. The search disclosed that it contained only four or five roofing tacks.
Davis' testimony concerning the happenings at the place where the encounter between him and Stalnaker occurred is partially corroborated by the testimony of Britton Davis, prosecuting witness' minor son, who testified that a few seconds after he heard the shot, he proceeded in the direction thereof and saw Stalnaker on top of his father, who was lying on his back, and that when this witness came in view Stalnaker looked around, saw him and got up, holding his gun in his hand.
About eight-thirty the same day, Davis testified he saw defendant coming down the hill in the direction of witness' residence, carrying a light after a vain search, which the defense witness testified was made in the woods on the hill and in the vicinity thereof in an endeavor to find the gun which the officers suspected Davis either had hidden or dropped before proceeding down the hill. As the light was seen along the public highway below prosecuting witness' house, Davis, two of his young sons, and two neighbor boys, named Russell Greenlief and Roy Alltop, Jr., approached Stalnaker, who covered witness and the boys with his flashlight. Then, witness making the first inquiry, the two men exchanged names. As Stalnaker walked away, he told witness he would be back as soon as he could get a warrant, and thereupon Davis replied, "All right, by God, I will be out in the house, but you had better get ready for the circuit court"; and continued, "Well, I have got holes in me, but I suppose you will not deny that shot on the hill", to which Davis testified defendant made no reply, but walked away, got into the parked car and drove off.
Davis' testimony bearing on the colloquy between him and Stalnaker is substantially corroborated by State's witnesses, Roy Alltop, Jr., and Russell Greenlief, who were at the Davis house on the night following the altercation between the two men, when the officers returned from their search of the woods on the hill for the gun, which they thought was in the possession of the prosecuting witness as he emerged from the woods when first seen by Stalnaker.
A pair of trousers was introduced in evidence, which Davis testified he was wearing at the time he claims he was shot, and which witness testified had two holes in the right leg thereof "and a little stain right there (indicating)."
About nine o'clock that night Davis went to Glenville, where he was treated by Dr. W. T. Smith, a practicing physician there, who testified that his examination disclosed a bullet wound in the posterior of the knee, which ranged down in the flesh and came out about three inches below the knee and in the front of Davis' right leg. Dr. Smith testified further that there were holes in the skin where the bullet went in and where it emerged at the upper part of the calf of the right leg near the knee. On crossexamination, erroneously designated in the record as "Direct Examination", Dr. Smith testified that the wound was in the soft tissues and muscles, and did not involve any tendon, and, so far as his examination disclosed, which was not accompanied by X-ray of Davis' leg, the bones of the leg were not injured or affected in any way.
Roy Alltop, Jr., who accompanied Davis on the occasion of his visit to Dr. Smith's office, testified that he saw Dr. Smith examine *911 the wound in Davis' leg, and saw Dr. Smith "take a prodding rod of some kind and run it in one way, I would say about half way through his leg, turn it, and bring it through the other way." This witness testified that he is familiar with powder burns, and that "Both of these scars on both sides of his leg was black on both sides"; and that Davis' trousers had two holes "in the leg".
Defendant's instructions Nos. 2, 4, 10, 12, 13 and 17, which the trial court gave, fully and fairly presented to the jury defendant's theory of defense.
Defendant's instruction No. 2 told the jury that they must find beyond a reasonable doubt "that the defendant intended to kill, or maim, or disable, or disfigure permanently, the prosecuting witness Davis * * *". Defendant's instruction No. 4 told the jury that the words "maim", "disfigure", and "disable", as used in Code, 61-2-9, the statute defining malicious wounding and unlawful wounding, and prescribing the punishment for each offense, "mean a permanent maiming, disfigurement, and disabling, * * * and not such a wound as may be only temporary." Defendant's instruction No. 10 properly instructed the jury on the defendant's theory of defense that the prosecuting witness was accidentally shot by defendant. Defendant's instruction No. 12 fully instructed the jury that, as an "enforcement officer", the defendant had the right to carry "a revolver", and that no inference of malice would arise from the fact that he was so armed. Defendant's instruction No. 13 correctly informed the jury that defendant, as an enforcement officer in attempting to enforce the law or to make an arrest, is under no obligation to retire to avoid the necessity of using all necessary measures to prevent receiving bodily injuries, and that it is the duty of an enforcement officer in attempting to make an arrest to press forward and accomplish the purpose of the arrest. And defendant's instruction No. 17, effectively instructed the jury on the question of reasonable doubt and the elements of the crimes of malicious wounding and unlawful wounding, which told the jury, in part, that if the State fails to establish the elements of the two crimes "beyond a reasonable doubt, * * * then you cannot convict the defendant of either malicious or unlawful wounding."
The grounds of error set forth in the brief filed by counsel for the defendant may be grouped generally as follows: (1) That the evidence adduced in support of the State's theory of the case is insufficient to ground conviction because there is no showing that the injury, if any, suffered by the prosecuting witness constituted a permanent maiming, disfiguring, or disabling injury within the meaning of Code, 61-2-9; (2) that the evidence bearing on defendant's intent to maim, disfigure and disable prosecuting witness is insufficient to sustain the verdict of conviction; and (3) the trial court erred in giving State's instruction No. 5, as modified.
In appraising the evidence bearing on the first and second grounds of error, we should be guided by the postulate that the weight of the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the evidence are exclusively within the province of the jury. State v. Sullivan, 55 W.Va. 597, pt. 2 syl., 47 S.E. 267; State v. Mayle, W.Va., 69 S.E.2d 212.
Defendant's first ground of error that the evidence bearing on the extent to which the prosecuting witness was maimed, disfigured, or disabled is insufficient, in our opinion, is without substantial merit. Taking as true the prosecuting witness' testimony that during the scuffle he managed to extricate his right leg and raise it, at which time he said he was shot in that leg, though in conflict with the testimony of the defendant bearing on that immediate subject, must be taken as true in view of the verdict of the jury. This testimony is fully supported by that of Dr. Smith that Davis did have a gunshot wound, which he probed to some extent on the evening following the altercation between Davis and the defendant, the testimony of Dr. Smith being corroborated by Roy Alltop, Jr., who was present at the time the prosecuting witness was being treated. Dr. Smith testified that the wound would leave permanent scars. In State v. Gibson, 67 W.Va. 548, 68 S.E. 295, *912 in point 2 of the syllabus, 28 L.R.A.,N.S., 965, this Court held that a wound within the meaning of Section 9, Chapter 144, Code, 1906 (Michie's Code, 61-2-9), must include "a complete parting or solution of the external or internal skin."
The evidence in this case, bearing on the question whether the defendant intended to shoot the prosecuting witness with intent to maim, disfigure or disable him, or whether the shot was accidental, is in direct conflict. If defendant's testimony is taken as true that the shot was caused to be fired when Davis kicked with his left leg or caught the lanyard to which the gun was attached with his left foot, the wound was unintentional, and, therefore, defendant was not guilty of either malicious wounding or unlawful wounding. If we take Davis' testimony as true, as the jury did, that after succeeding in extricating his right leg from under defendant's arm, he was shot as he raised that leg in order to push defendant off him, there is nothing to show that the gun was caused to be fired wounding Davis in his right leg by anything other than defendant's voluntary act. To support a finding of malicious wounding or unlawful wounding under Code, 61-2-9, the intent to produce a permanent disability or disfiguration is an essence of the crimes of malicious wounding and unlawful wounding. State v. Taylor, 105 W.Va. 298, 142 S.E. 254. See also State v. Meadows, 18 W.Va. 658; McComas v. Warth, Judge, 113 W.Va. 163, 167 S.E. 96. In the criminal case involved in the mandamus proceeding in the McComas case, the relator McComas, a police officer, was charged with the use of a policeman's mace with the intent to maim, disfigure, and disable the prosecuting witness.
The instant defendant, being a game protector, had the right to carry a pistol or other firearms, under Code, 20-2-4, as amended by Section 4, Article 2, Chapter 5, Acts of the Legislature, Regular Session, 1933; and the jury could not infer from the mere fact that the defendant was armed that defendant entertained an intent to maim, disfigure or disable the prosecuting witness. However, as this record contains substantial evidence to the effect that defendant's gun was fired at the time he had the prosecuting witness effectively pinned to the ground, the firing of the gun evidently was not necessary to protect defendant from death or bodily harm. That being so, the jury, in our opinion, had a right to find, as it did, that the gun was unnecessarily fired with an intent on defendant's part to maim, disfigure or disable the prosecuting witness. "The presence of criminal intent or purpose is a question of fact, to be determined by the jury from all the circumstances proved." 5 M.J., Criminal Procedure, Section 50, citing State v. Cross, 42 W.Va. 253, pt. 4 syl., 24 S.E. 996.
Though defendant was a game protector and at the time he shot the prosecuting witness he was in the act of effectuating an arrest for violation of the game laws of this State, which, under Chapter 20, West Virginia Code, as amended, is a misdemeanor, or in repelling an assault on defendant by the prosecuting witness, the jury had the right to find, as it did, that defendant, under the circumstances portrayed by this record, used unnecessary force. In Town of Nutterfort ex rel. Queen v. Corbin, 119 W.Va. 324, 193 S.E. 560, this Court held that the question whether an officer has used excessive force in making an arrest is a question for the jury under proper instruction pertaining to the officer's duty to make the arrest and to defend himself.
We are, therefore, of opinion that the evidence in this case is sufficient for the jury to find beyond a reasonable doubt that defendant, without just cause, shot the prosecuting witness with the intent of maiming, disfiguring, or disabling the prosecuting witness.
At the trial the court gave all of the instructions tendered by counsel for the defendant, and refused to give any of the instructions offered by the State, except State's instructions Nos. 1 and 5, as modified. State's instruction No. 1 so clearly states the law applicable to this case that it merits no discussion, but on this writ of error the defendant assigns error to the giving of State's instruction No. 5, as modified, which reads:
"The Court further instructs the jury that if you believe from the evidence *913 in this case beyond all reasonable doubt, that the prosecuting witness, Davis, at the time of the altercation mentioned in the evidence was on his own premises, and you further believe from all the evidence beyond a reasonable doubt, that the defendant was at the time a trespasser on the lands of the prosecuting witness and that a quarrel ensued between them, words, however, grievous, would not justify the defendant in making an unlawful assault upon the prosecuting witness, Davis, if you believe from the evidence beyond all reasonable doubt he made such an assault, and brought on the combat, and that during such combat, he shot the said Davis with intent to maim, disfigure, disable and kill him, and inflicted the wound mentioned in the evidence, then you should find him guilty of malicious wounding as charged in the indictment, and you are further instructed that if you believe from the evidence the defendant had good cause to believe, and did believe, that at the time and place of the altercation in question, the game laws of the State of West Virginia were being violated on the lands of said Davis, then the defendant, as a conservation officer, had a legal right to go upon the lands of said Davis for the purpose of investigating such apparent law violations."
Inherent in this instruction are two vices: (1) It presents for jury determination the question whether at the time of the altercation between the prosecuting witness and the defendant, defendant was a trespasser on the former's land; and (2) the modification of the instruction likewise presents to the jury the question whether defendant, as a conservation officer, had the legal right to go upon the prosecuting witness' lands for the purpose of investigating "such" apparent law violations. Both these questions, under the facts portrayed by this record, are questions of law, and should not have been submitted to the jury.
Both under the statutes of this State creating "The Conservation Commission of West Virginia", prescribing the powers and duties of the director and the powers of conservation officers, and under the facts of this record, defendant had the lawful right to go upon the prosecuting witness' lands. Section 7(9), Article 1-A, Chapter 70, Acts of West Virginia Legislature, Regular Session, 1945, amending and reenacting, among others, Section 7 of Article 1-A, of Chapter 20 of Code, 1931, as last amended, relating to the reorganization and powers of the conservation commission of this State, provides that the director of conservation may "Enter private lands to make surveys or inspections for conservation purposes". And, under said Chapter 20, Code, Section 3 of Article II, as amended by Chapter 5, Acts of the West Virginia Legislature, Regular Session, 1933, provides: "* * * The game protectors shall have full power and authority to execute and serve any search warrant, notice or any process of law issued under this chapter or any law enacted relating to game animals, fish, frogs, wild birds and wild fowls, and forests, issued by any justice of the peace or by any court having jurisdiction thereof, in the same manner, with the same power and authority, and to and with the same legal effect, as any constable or sheriff can serve or execute such search warrant, notice or process. They may arrest on sight, without a warrant or other court process, any person or persons detected by them in the violation of any of the provisions of this chapter or of any law of this state relating to game animals, fish, frogs, wild birds and fowls, and forests; and shall, under the supervision and direction of the commission, do all things necessary to properly carry into effect the provisions of this chapter."
As the director of conservation can act effectively only with the aid of the conservation officers employed by the conservation commission, the defendant Stalnaker, accompanied as he was by conservation officers, Thompson and Miller, had the right under Chapter 20, West Virginia Code, as amended by Acts of the Legislature, Regular Session, 1945, Chapter 70, Article 1-A, Section 7(9) to enter upon the prosecuting witness' lands, and having heard shots, they had reason to believe, and evidently did believe, *914 that the conservation laws of this State were being violated on or near the Davis farm on Leading Creek in Gilmer County. So the question of their right so to enter was one of law, which should not have been submitted to the jury. United States v. Keller, C.C.W.Va., 19 F. 633; State v. Dickey, 48 W.Va. 325, 37 S.E. 695; Jones v. Town of LaCrosse, 180 Va. 406, 23 S.E.2d 142. In fact, the trial court, if requested so to do, could properly, and perhaps should have instructed the jury as to defendant's powers and rights in the premises, under the statute, as well as under the facts portrayed by this record.
We are of opinion that the giving of State's instruction No. 5, as modified, was prejudicial error. In so holding we are well aware that the instruction was one bearing on the crime of malicious wounding; whereas the defendant was acquitted of malicious wounding but was convicted of unlawful wounding. Likewise this Court is fully aware of the rule long established by this Court in criminal cases set forth in point 1 of the syllabus of State v. Johnson, 108 W.Va. 630, 152 S.E. 203, that "Where a conviction for a lower degree of an offense is sustained by the evidence, an instruction on a higher degree, though erroneous, is immaterial." And the holdings of this Court in the cases of State v. Stanley, 112 W.Va. 310, 313, 164 S.E. 254; State v. Bowles, 117 W.Va. 217, 221, 185 S.E. 205; State v. Barker, 128 W.Va. 744, 751, 38 S.E.2d 346; and State v. Toler, 129 W.Va. 575, 581, 41 S.E.2d 850, and that this rule has been applied by this Court categorically in point 3 of the syllabus of the case of State v. Bowles, 109 W.Va. 174, 153 S.E. 308, to a case in which a defendant was indicted for malicious wounding, and, as in the instant case, he was acquitted of malicious wounding and convicted of the charge of unlawful wounding. These cases should be distinguished from the instant case. The vice in the instruction under consideration is that the instruction permitted the jury to determine the questions whether defendant was a trespasser, and whether he had the legal right to go upon Davis' lands for the purpose of investigating apparent law violations, would apply to a case of unlawful wounding, as well as to one of malicious wounding. This instruction, in our opinion, placed an impediment to the defendant's defense before the jury, which he should not be required to overcome. The instruction involved in the Bowles case was not set forth in the opinion of the Court. From the printed record, however, it appears that this instruction was erroneous simply on the question of malicious wounding, and it did not contain any extraneous matters which would increase defendant's burden to maintain his defense, such as are contained in the instant instruction. If defendant was guilty of any crime, it was not because he wrongfully entered upon the prosecuting witness' lands but because of what he did after he and his co-officer Thompson entered thereon.
On the basis of this instruction alone we reverse the judgment of conviction, set aside the verdict, and grant defendant a new trial.
Judgment reversed; verdict set aside; new trial awarded.
HAYMOND, President (dissenting).
The sole ground on which the majority of this Court reverses the judgment is that the circuit court committed reversible error in giving an incorrect instruction which related to the offense of malicious wounding for which defendant was indicted. The defendant was acquitted of that offense but was convicted of the lesser offense of unlawful wounding. In my opinion the action of the circuit court in giving the instruction was not prejudicial to the defendant, and for that reason I dissent from the holding of the majority in reversing the judgment of that court.
This Court has repeatedly held in its recent decisions that in a case in which a conviction for a lower degree of an offense is sustained by the evidence an erroneous instruction relating to an offense of a higher degree is immaterial and does not constitute reversible error. State v. Johnson, 108 W.Va. 630, 152 S.E. 203; State v. Toler, 129 W.Va. 575, 41 S.E.2d 850; State v. Barker, 128 W.Va. 744, 38 S.E.2d 346; State v. Bowles, 117 W.Va. 217, 185 S.E. *915 205; State v. Stanley, 112 W.Va. 310, 164 S.E. 254. The majority opinion cites each of these cases and refers particularly to the case of State v. Johnson, 108 W.Va. 630, 152 S.E. 203. It also cites and comments upon the case of State v. Bowles, 109 W.Va. 174, 153 S.E. 308, in which, as here, the defendant, upon an indictment for malicious wounding, was acquitted of that offense but convicted of the lesser offense of unlawful wounding and in which this Court held that the refusal to give an instruction relating to malicious wounding did not prejudice the defendant because the verdict of the jury acquitted him of that offense. The majority opinion, though omitting to do so, might well have cited also the cases of State v. Jones, 128 W.Va. 496, 37 S.E.2d 103; State v. McLane, 126 W.Va. 219, 27 S.E.2d 604; and State v. Gunter, 123 W.Va. 569, 17 S.E.2d 46; in all of which the foregoing rule was recognized and applied. The majority opinion also recognizes the existence of the rule and its application in each of the cases which it cites in connection with the rule. The opinion, however, instead of applying the rule which it expressly recognizes in this case, engages in a labored and, in my opinion, an unsuccessful effort to distinguish the cited cases from the case at bar. In so doing it makes a substantial departure from the rule, creates an unsatisfactory and equivocal exception to it, and renders its application in any particular case questionable to the extent that it is in effect destroyed as a practical rule of law. In my judgment the rule should be applied in all cases which come within it or it should be rejected in its entirety and not applied in any such case. To apply it in one case and to refuse to apply it in another similar case merely adds to the existing uncertainty in the administration of justice in the disposition of cases which has engendered criticism of our system of criminal law.
As I understand the rule, it is based on the unquestioned assumption that the instruction dealing with a higher degree of an offense contains error which would be prejudicial if the defendant were convicted of that offense but that the error, regardless of its character or degree, is not prejudicial if the defendant is acquitted of a higher degree, but is convicted of a lower degree, of the offense. One of the reasons for the rule is that it may be fairly presumed that in a criminal case based upon an indictment for an offense of a higher degree in which an erroneous instruction upon such offense is given, and in which the defendant is acquitted of that offense but is convicted of an offense of a lower degree, the jury disregards such instruction in its entirety and, by its verdict of acquittal of the offense of a higher degree, indicates clearly that, regardless of the character of the error in the instruction, the jury was in no wise influenced by any statement embraced within it. If that be so, as I think it is, the rule should be applied in the instant case.
The majority seeks to justify its holding that the action of the trial court in giving the instruction, designated as State's Instruction No. 5, as amended, constituted prejudicial error because, by certain statements in the instruction, it submitted to the jury the questions whether defendant was a trespasser and whether he had the right to go upon the land of the prosecuting witness to investigate apparent violations of law which were questions of law. Those statements in the instruction, of course, dealt with and were limited to the offense of malicious wounding. The nature or the degree of the error in the instruction is in my judgment of no consequence and the action of the majority in regarding that particular error as prejudicial seems to me to be entirely unwarranted. It is also contrary to the reasoning expressed by this Court in the recent case of State v. McLane, 126 W.Va. 219, 27 S.E.2d 604, 607. In the McLane case, upon an indictment for murder, the defendant was convicted of murder of the second degree which conviction, of course, constituted an acquittal of the higher offense of murder of the first degree. In that case an instruction offered by the State dealt with and defined the elements of murder of the first degree. As the evidence in the case justified a conviction of no higher offense than murder of the second degree, in defining the offense of murder of the first degree, the instruction submitted a question of law to the jury *916 which the defendant contended unduly inflamed and influenced the jury. Concerning the instruction this Court said: "There being no question raised as to the evidence justifying this instruction, but the assigned error being entirely a question of law, we are of the opinion that it did not constitute error for the trial court to approve it."
In the cases of State v. Toler, 129 W.Va. 575, 41 S.E.2d 850; State v. Bowles, 117 W.Va. 217, 185 S.E. 205; State v. Stanley, 112 W.Va. 310, 164 S.E. 254, cited in the majority opinion, and the cases of State v. McLane, 126 W.Va. 219, 27 S.E.2d 604, and State v. Gunter, 123 W.Va. 569, 17 S.E.2d 46, in which an instruction relating to murder of the first degree was given, and the defendant, though acquitted of that offense, was convicted of the offense of murder of the second degree, this Court held that the giving of such instruction did not constitute prejudicial error. As the offense of second degree murder, the conviction of which in each of the cases just cited was upheld, is a much more serious offense than that of unlawful wounding, of which the defendant was convicted in the case at bar, and as the rule relating to an instruction of a higher degree of an offense was recognized and applied by this Court in the above cited cases in which a conviction of murder of the second degree was sustained, there appears to be no justifiable reason for refusing to apply the rule in the case at bar.
It is also pertinent to observe that in the above cited cases, in which the foregoing rule was applied and it was held that a defendant was not prejudiced by an erroneous instruction relating to an offense of a higher degree of which he was acquitted, the kind or the degree of error in the instruction was not discussed or considered.
The defendant had a fair trial which, under the foregoing rule as recognized and applied in prior decisions of this Court, was free from prejudicial error; and the evidence shows beyond any reasonable doubt that the defendant was guilty of the offense of which he was convicted. As the action of the trial court in giving the instruction complained of did not prejudice the defendant and is not a sufficient ground for reversal, I would affirm the judgment.