STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. GEORGE RILEY AND LESTER RILEY, DEFENDANTS-RESPONDENTS.

Argued September 22, 1958—Decided November 3, 1958.

*Mr. Solomon Lautman,* First Assistant Prosecutor, argued the cause for the State (*Mr. Vincent P. Keuper,* Monmouth County Prosecutor, attorney).

*Mr. Louis H. Green* argued the cause for the respondents.

The opinion of the ·court was delivered by

WACHENFELD, J. Under an indictment in three counts handed down by the Monmouth County grand jury in March of 1957, George Riley and his brother, Lester Riley, were convicted of the crimes of rape, assault with intent to commit rape and atrocious assault and battery. George Riley was sentenced to the State Prison for not less than 10 nor more than 15 years on the rape conviction while sentence was suspended on the other two counts. On the rape charge, Lester Riley was committed to the New Jersey State Hospital for a period not to exceed 30 years. He, too, received suspended .sentences on the other two convictions.

George alone appealed to the Appellate Division, which reversed his convictions of assault with intent to commit rape and atrocious assault and battery. That tribunal, on the grounds hereinafter discussed, also reversed the rape convictions of both George and Lester and ordered a new trial on the rape charge against them. We granted the State's petition for certification, 27 *N. J.* 279.

The crimes in question were allegedly perpetrated on February 26, 1957. For the purposes of this opinion, the victims will be referred to as Betty and Roger. At the time the subject offenses were supposedly committed, Betty was a high school senior of 17 years of age. Roger was a boy friend who had been dating her on the average of three times a week for approximately five months.

According to Betty's testimony at the trial, she and Roger had a prearranged date for the evening of February 26. They left Betty's home in Eatontown in Roger's automobile at about 7:30 P. M. and drove around the nearby countryside for several hours, eventually stopping at a restaurant. After they had eaten, they started for Betty's home. She stated that the headlights of Roger's car began to grow dim, or failed completely, so Roger backed into a "driveway" off Grand Avenue in Eatontown and extinguished his lights in order to let them "cool off." The time was approximately 10:30 P. M. Betty testified that on a prior occasion while she was out with Roger the headlights of his car had not functioned properly. She admitted that she and Roger had parked in the same place once before. Apparently, the "driveway" is not connected to any residence. Betty stated that Roger's car was parked about one-half its length from the street on the night in question.

She and Roger sat in the automobile talking and listening to the radio. Both testified that they were not engaged in any amorous adventures. After a short interval had elapsed, another automobile turned into the driveway with only its parking lights illuminated. This car was blocked by Roger's automobile, and its driver blinked his parking lights. Roger interpreted this as a signal that the driver of the strange car wished to pass so he moved his own automobile further back into the driveway. The other car drove to a "clearing" just behind where Roger was parked and stopped.

Betty and Roger continued listening to the radio for several more minutes when suddenly the doors of Roger's car were flung open by four men who were yelling and

screaming. The intruders had scarves over their faces and one of them began hitting Roger with a "stick" or "club." Two others seized Betty by the shoulders and pulled her out of the automobile, dragging her over to the strange car, where they forced her into a prone position on the back seat. She was hysterical, and one of her assailants kept slapping her with the back of his hand and telling her to be quiet. A suede jacket was thrown over her head and each of the men then raped her.

After the criminal acts had been consummated, the rapists told Betty they would let her go but that if she did not stop screaming they would kill her. They then dragged her back to Roger's car and pushed her inside. Roger's car keys were returned to him, and both he and Betty were threatened with violence if they told anyone of what had occurred. Roger promptly drove off and notified the Eatontown police of the commission of the crimes.

George and Lester Riley, their younger brother Melvin, and one Charles Thornton were apprehended as the culprits. They admitted having encountered Betty and Roger in the driveway off Grand Avenue on the night of February 26 but denied committing any crime. The two older Rileys and Charles Thornton were jointly indicted, but a severance was granted to Thornton, who testified as a State's witness against the Rileys. Melvin Riley was treated as a juvenile delinquent and not indicted since he was only 17 years old. Betty positively identified George and Lester Riley as her assailants despite the fact that their faces had been covered with scarves and she had only seen their eyes and the "shape" of their hair. Roger testified that he could not recognize any of the men who had attacked him.

The stories told at the trial by the Rileys and Thornton coincided to some degree. They testified that they, in company with Melvin, had left a movie in Long Branch at around 10:30 P. M. and were returning home down Grand Avenue in Eatontown when they noticed a darkened car parked in a driveway. George Riley claimed to have seen the same car parked there on previous occasions.

On the spur of the moment, the four boys decided to turn into the driveway with the idea in mind, according to Thornton, that they would "scare" the occupants of the parked car by pretending to be policemen. George and Lester testified that the headlights of their car were on and that after they had entered the driveway they could see a girl's legs resting on the dashboard near the steering wheel and a boy's head on the passenger's side of the parked auto. Thornton merely stated that he saw the front seat of the car blocking the driveway was occupied by a boy and a girl.

George Riley blinked his lights, and the parked automobile was thereupon backed up sufficiently to allow the Rileys' car to pass. George brought his car to a stop a short distance behind the other vehicle and he, Lester, Melvin and Thornton spent several minutes debating what their course of action should be. Thornton stated that during this interval the heads of the occupants of the first car had disappeared from sight, but that he could see one of the girl's legs in a window.

Finally, the Rileys and Thornton emerged from their automobile and walked up to the other car. George Riley stated the doors of this car were not completely closed. Thornton testified he saw Betty and Roger in the act of sexual intercourse. George Riley did not say that Roger and Betty were actually engaged in having sexual relations, merely stating that, after the doors of Roger's car had been thrown open, Roger would not look at him "until he fixed his pants." Lester Riley was not questioned as to what he had seen upon his arrival at Roger's car.

Each of the Rileys denied striking Roger and testified that they had not seen any member of their party with a stick or club in his hand. They stated Betty had gotten out of Roger's car voluntarily and was "hollering" so much that they went over to her in order to calm her. They both testified that they did not take Betty to their own car, but instead walked her back to Roger's car, telling her not to be afraid. George Riley stated that his brother Melvin had recognized Betty as a classmate and that he, George, had thereupon asked Betty, "Does your mother know that you

are out here?" According to George, Betty willingly re-entered Roger's car and the respective parties then drove off. Lester testified the Rileys spent no more than five or ten minutes at the scene.

Thornton's testimony materially diverged from that of the two Rileys at the point where the intruders had revealed their presence to Roger and Betty by pulling open the doors of Roger's car. Thornton testified that Roger "jumped up" and that someone thereupon hit him. George then came around to the passenger's side of the car, where Thornton was located, and "took the girl out of the car and took her over to his car, and she hollered, and then Lester, he left from the fellow's car and he went over there to where George and the girl were." Lester gave Thornton a stick to hold and Thornton went around to the driver's side of Roger's car, leaving Melvin on the passenger's side. Thornton stated he and Melvin had stood beside Roger's car for an indeterminate length of time while George and Lester were with Betty. He denied that he and Melvin were consciously "guarding" Roger during this period. On cross-examination, he also denied seeing either George or Lester get into the Riley car with Betty. Finally, Thornton admitted he had heard Lester tell Roger "that he knew his license number and for him not to say anything * * * about it to anybody."

At the request of the Eatontown police, Dr. George Henkel, Jr., examined Roger and Betty at about 1:45 A. M. on the morning of February 27. He testified that he had found a five-inch welt, or raised bruise, on Roger's left arm, a two-inch welt on his left wrist and another on the left angle of his jaw. The doctor stated that in his opinion these injuries had been caused by blows from a stick or club.

His examination of Betty revealed a recently inflicted abrasion on her left temple and a large, fresh bruise near her left eye. Her genitalia were inflamed and swollen as though they "had been traumatized or irritated quite a bit," and her hymenal ring had been ruptured and was bleeding. Vaginal smears disclosed the presence of highly motile sperm

indicating recent intercourse. The doctor testified that Betty was greatly disheveled and in shock and that her underpants had blood on them.

Dr. John P. Duffy, a chemist and toxicologist, was called as an expert witness on behalf of the State. He testified that he had found seminal stains on the skirt Betty was wearing the night of February 26 and that he had discovered adhering to her underpants a deeply pigmented hair which could only have come from a colored person.

Sergeant Harry Leo of the Eatontown Police Force testified as to Betty's physical appearance when he went to her home at around 10:00 A. M. on the 27th of February. He said he had observed that her lips were greatly swollen and that "She had a very large swelling about the size of an orange about the eye * * * and near the temple she had a swelling there and was starting to discolor."

■■ The Appellate Division held it was error for the trial judge to permit the jury to return verdicts of guilt against the appealing defendant, George Riley, on both the count charging rape and that charging assault with intent to commit rape, and the State so concedes. We are in accord.

The lesser crime of assault with intent to commit rape is necessarily a constituent element of the greater crime of rape, and the two merge when a conviction for the greater ensues. *Cook v. The State,* 24 *N. J. L.* 843 (*E. & A.* 1855). The offense of rape embodies but one criminal transaction, and the liability for that offense may not be fractionalized according to its component parts. See *State v. Hill,* 44 *N. J. Super.* 110 (*App. Div.* 1957); *State v. Landeros,* 32 *N. J. Super.* 168 (*App. Div.* 1954), reversed on other grounds, 20 *N. J.* 69 (1955).

George Riley's conviction of the crime of atrocious assault and battery upon the person of Roger was reversed by the Appellate Division on the ground that the State had utterly failed to prove the identity of Roger's attacker. Defendant asserts the conviction was also erroneous for the reason that the alleged battery did not result in a breaking of Roger's skin. *N. J. S.* 2A :90–1 provides: "Any person who commits

an atrocious assault and battery by maiming or wounding another is guilty of a high misdemeanor." It is contended an essential part of a "wounding" is a severing of the skin and that since Roger's injuries consisted of welts, his assailants could only be guilty of, at best, simple assault and battery. The Appellate Division discussed this last question but did not pass on its merits.

There was ample evidence to establish that Roger had been battered in a vicious fashion with a stick or club, and we think it is immaterial that the precise identity of his assailant remains unknown. Obviously, the culprit was one of the Rileys or Charles Thornton. They were all linked inextricably as principals in the commission of the crime on which they had embarked.

*N. J. S. 2A*:85–14 specifies:

"Any person who aids, abets, counsels, commands, induces or procures another to commit a crime is punishable as a principal.

Any person who wilfully causes another to commit a crime is punishable as a principal."

The jury could properly infer from the evidence presented that the four boys involved in the crime had conferred in their own car as to what they would do to the occupants of Roger's car and that they then formed a plan to permit George and Lester to rape Betty while Charles Thornton and Melvin Riley guarded Roger. From this, it could rightfully have been deduced that a part of the plan was to immediately attack and intimidate or disable Roger so that he could not afford resistance in Betty's behalf. Certainly, the rape was carried out with swift and precise dispatch. Within a few moments, Roger had been removed as a factor in the affray and Betty had been carried off to the Rileys' car while Thornton and Melvin Riley remained behind, posted on each side of Roger's automobile.

It seems evident that if George Riley did not actually commit the battery upon Roger, he at least aided, abetted, counseled, commanded, induced or procured its commission. Regardless of the nature of his role, he would still be guilty

as a principal. We therefore deem it was error to reverse his conviction merely because there was no conclusive proof that he had actually wielded the stick or club used in the assault. *State v. Cooper,* 10 *N. J.* 532 (1953); *State v. Hanrahan,* 87 *N. J. L.* 1 (*Sup. Ct.* 1915), affirmed *p. c.* 88 *N. J. L.* 391 (*E. & A.* 1915); *State v. Hess,* 65 *N. J. L.* 544 (*Sup. Ct.* 1900).

 This brings us to the question which the Appellate Division, under its disposition of the case, found it unnecessary to decide: must the skin of the victim be broken in order to bring a battery within the purview of the statute defining atrocious assault and battery? The answer to be given depends upon the intended meaning of the word "wounding" as it is used in *N. J. S.* 2*A* :90–1.

*N. J. S.* 2*A* :90–1 reads:

"Any person who commits an atrocious assault and battery by maiming or wounding another is guilty of a high misdemeanor."

If a breaking of the skin is required to constitute a "wounding" within the statutory intendment, then the defendant is obviously not guilty of the crime charged against him because the injuries inflicted on Roger consisted of welts alone.

Atrocious assault and battery is defined in *State v. Capawanna,* 118 *N. J. L.* 429, 432 (*Sup. Ct.* 1937), affirmed *p. c.* 119 *N. J. L.* 337 (*E. & A.* 1938), as follows:

"* * * where the maiming or wounding is done by an assault and battery that is savagely brutal or outrageously or inhumanly cruel or violent, it amounts to an atrocious assault and battery within the intendment of our law. * * *"

This opinion strongly implies that in deciding whether atrocious assault and battery has been committed, in our jurisdiction we will look to the brutal quality of the defendant's act more than to the nature and severity of the injury inflicted. Similarly, in *State v. Maier,* 13 *N. J.* 235 (1953), the late Chief Justice Vanderbilt stated that *N. J. S.* 2*A* :90–1 could be distinguished from the other statutes pertaining

to aggravated assault and battery because it penalized the "vicious act" of the defendant rather than his evil purpose, *N. J. S.* 2*A* :90–2, or his use of offensive weapons or threats of violence, *N. J. S.* 2*A* :90–3. In *State v. McGrath,* 17 *N. J.* 41, 49 (1954), this court, discussing the difference between simple assault and battery and atrocious assault and battery, again stressed the nature of the act itself as the important element:

"* * * Similarly, we are here concerned with offenses that are not identical. One is a crime, the other a disorderly persons offense. The one requires the element of atrociousness in the form of 'maiming or wounding,' *N. J. S.* 2*A* :90–1, 'savage and cruel in character,' *State v. Capawanna,* 118 *N. J. L.* 429, 431 (*Sup. Ct.* 1937), affirmed 119 *N. J. L.* 337 (*E. & A.* 1938), that is not present in the other."

The statute itself says nothing about a severing of the skin being essential to a "wounding," and if this is to be the rule, then it is established through and by judicial adjudications, although there are none in this jurisdiction so holding.

There is ample authority elsewhere that a "wound," as the word is used in a criminal statute, requires a complete parting or solution of the external or internal skin. *State v. Gibson,* 67 *W. Va.* 548, 68 *S. E.* 295, 28 *L. R. A., N. S.,* 965 (*Sup. Ct. App.* 1910); *Harris v. Commonwealth,* 150 *Va.* 580, 142 *S. E.* 354, 58 *A. L. R.* 1316 (*Sup. Ct. App.* 1928); *State v. Henggeler,* 312 *Mo.* 15, 278 *S. W.* 743 (*Sup. Ct.* 1925); *Johnson v. Commonwealth,* 184 *Va.* 409, 35 *S. E. 2d* 594 (*Sup. Ct. App.* 1945); *State v. Stalnaker,* 138 *W. Va.* 30, 76 *S. E. 2d* 906 (*Sup. Ct. App.* 1953); *Annotation,* 16 *A. L. R.,* 955, 958 (1922).

So, too, there is much authority to the contrary. In *Gatlin v. State,* 18 *Ga. App.* 9, 89 *S. E.* 345 (*Ct. App.* 1916), the court said the word "wound" should not be given a strained or technical meaning but that its plain, obvious meaning should be employed:

"* * *. a 'wound' does not necessarily import a breaking of the skin, but includes injuries of every kind which affect the body,

whether they are cuts, lacerations, fractures, or bruises." (89 *S. E.* at *page* 345)

In accord are *State v. Hammerli,* 60 *Kan.* 860, 58 *P.* 559 (*Sup. Ct.* 1899), and *People v. Durand,* 307 *Ill.* 611, 139 *N. E.* 78 (*Sup. Ct.* 1923) ; while *Bouvier's Law Dictionary* (*Baldwin's Cent. Ed.* 1940) defines "wound" as follows:

"Wound. Any lesion of the body.
In this it differs from the meaning of the word when used in surgery. The latter only refers to a solution of continuity; while the former comprises not only these, but also every other kind of accident, such as bruises, contusions, fractures, dislocations, and the like."

We are not inclined to accept the highly arbitrary rule that "wounding" must necessarily entail a breaking of the skin.

Its application may well lead to absurd results defeating the very purposes of the statute. It would be ludicrous to hold that a 250-pound assailant who had thrown his much smaller victim violently to the ground and then viciously struck and kicked him in and about his body, not breaking the skin but causing severe internal injuries, would be guilty only of the crime of simple assault and battery, now downgraded to a disorderly persons offense. *N. J. S.* 2A:170–26; *State v. Maier, supra.*

Here, the defendants descended on Roger out of the blackness of the night in a nefarious endeavor to isolate him from interfering with or preventing their savage raping of his girl companion, and to accomplish this they beat him with a stick or club in a prolonged attack, striking him on the arm, back and jaw and thereby causing substantial welts and bruises, one of which was five inches long. Under these circumstances, we think the jury was justly entitled to return a verdict of guilt on the count charging atrocious assault and battery.

It would be impracticable to endeavor to spell out a precise rule which would, *in futuro,* automatically decipher the

difference on all occasions between simple assault and battery and atrocious assault and battery no matter what the facts might be.

Our interpretation of the word "wounding," to the extent pronounced, will be helpful in this regard, but the matter will depend upon the factual situation as encountered in each individual case.

██ Principally on the basis of its conclusion that the trial judge had excessively and improperly intervened in the examination and cross-examination of Betty, the Appellate Division held "that defendant's rights were so prejudiced as to deprive him of a fair and impartial trial, requiring reversal of the conviction on the rape charge." It is urged by defendant that the trial judge took over the questioning of the complaining witness at two critical junctures in the case and by the extent and form of his questions, and their repetition, wrongfully promoted the State's cause.

Defendant necessarily concedes a trial judge has a right to participate in a criminal trial and to ask questions of a witness. We have long since receded from the arbitrary and artificial methods of the pure adversary system of litigation which regards the opposing lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed. See 3 *Wigmore, Evidence* (1940 *ed.*), § 784. The judge may, on his own initiative and within his sound discretion, interrogate witnesses for the purpose of eliciting facts material to the trial. *Village of Ridgewood v. Sreel Investment Corp.*, 28 *N. J.* 121 (1958); 3 *Wigmore, supra;* Annotation, 11 *A. L. R.* 1172 (1933); 53 *Am. Jur., Trial,* § 75. In the reports of our own jurisdiction, we find many instances where trial judges were sustained in their right to ask questions of crucial importance to the resolution of the cause before them. *E. g., Highway Trailer Co., Inc., v. Long Branch Auto Co.*, 114 *N. J. L.* 317 (*E. & A.* 1935); *State v. Aeschbach,* 107 *N. J. L.* 433 (*E. & A.* 1930); *State v. Manno,* 29 *N. J. Super.* 411 (*App. Div.* 1954). Although it has been said that the instances are not too

frequent in which a presiding judge will be justified in conducting an extensive examination, 98 *C. J. S. Witnesses* § 347, the matter is one which necessarily rests in discretion and depends upon the circumstances of the particular case. 53 *Am. Jur., supra;* Annotation, 11 *A. L. R., supra.* Many of those jurisdictions which tightly circumscribe the right of a trial judge to ask questions do so by an extension of statutes prohibiting comments upon the evidence in the charge to the jury. 3 *Wigmore, supra.* And see cases cited in Annotation, 11 *A. L. R., supra.* New Jersey, however, permits the trial judge to comment freely upon the evidence. *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.* 1935). *Cf. State v. Jefferson,* 129 *N. J. L.* 308 (*E. & A.* 1942).

Here, on both the direct and cross-examinations of Betty the trial judge intervened when the questioning attorney had reached the point where she was required to vouchsafe the intimate details of her ravishment. In each instance, the judge continued a line of questioning which counsel had inaugurated. The record affords impressive evidence that the judge was constrained to take over the questioning by virtue of Betty's understandable emotional distress and reluctance to testify, before the jury, court attendants and spectators, as to the forcible violation of her body.

The court first interrupted after Betty had testified that the elder Rileys had forced her down on the back seat of their car and had slapped her in order to silence her hysterical outburst. She stated "everything just went black and dazed like." The prosecutor then asked: "And then what is the next thing that you know happened?" Here, the witness apparently, from fright or shame, exhibited some hesitancy, for the court intervened by repeating, in substance, the prosecutor's last question: "Just tell us what happened there if you will."

From this point on, the trial judge asked 38 questions of the witness, nearly all of them designed to encourage her to relate the details of the rapes. On no less than six separate occasions, he was forced to calm the witness before she could continue with her story. A most striking example

of the highly agitated and emotionally disturbed state of the young girl is afforded by the following exchange:

"MR. LAUTMAN: Can you tell us any better than that what they did? What was happening to you that never happened before?

THE COURT: Collect yourself, will you?

THE WITNESS: Yes, sir.

THE COURT: Just relax. Sit back in the chair, if you can. That's right. Just relax. Lean back. That's right. Now, relax, and you tell us what was happening to you, if you know. You say one of these men was on top of you; is that right?

THE WITNESS: Yes, and one was at my head."

Defendant objected to the whole series of questions asked by the judge on direct examination.

On cross-examination counsel for the defense asked: "What do you mean by being raped?" Again, it is obvious from the record that the witness was distressed and embarrassed by the reopening of this line of inquiry. One example will suffice to demonstrate the understandable difficulty encountered by the court in placing the testimony on the record:

"THE COURT: What was happening to you, if anything, when you say they were having intercourse?

THE WITNESS: I don't know how to say it.

THE COURT: Well, you say it any way that you know how to say it. It is perfectly all right, and the quicker you tell us all about it, I am sure the quicker you will get off that chair. Just what do you mean by being raped and what do you mean by having intercourse? What do you understand intercourse is?

THE WITNESS: It is just what it is."

The chagrin and humiliation unavoidably imposed on Betty during the course of her inquisition is best illustrated by the emotional outburst of a woman spectator who impulsively shouted: "We can't go on like this." The judge first ordered the woman removed from the courtroom but then permitted her to remain on the condition that she maintain silence. This occurrence depicts the charged atmosphere of the courtroom and the difficulties encountered in a more graphic manner than words alone can accomplish.

Defense counsel did not object to any of the questions propounded by the trial judge during cross-examination.

We think the circumstances of the instant case compelled the trial judge, in the interests of safeguarding the proper administration of criminal justice, to make liberal use of his prerogative to question the complaining witness. She was a young girl who had undergone a vile experience which will probably stigmatize the rest of her life. She was anguished and sorely distressed by the necessity of having to relate the very minutiae of the obscenities forced upon her. The reassurance of the trial judge was required to enable her to continue to the bitter, painful end of her story. Experience shows that in cases involving sex offenses the inherent dignity and authority of the robed judge can clothe intimate and personal questions with a sense of decency and propriety which relieves to some degree the female witness' embarrassment and permits her full story to be told in a lucid fashion. This is peculiarly so in the instant case.

*Stinson v. State,* 125 *Ark.* 339, 189 *S. W.* 49, 51 (*Sup. Ct.* 1916), is almost directly in point. There it was urged that the trial court had erred in propounding leading questions to the 15-year-old complaining witness in a prosecution for carnal abuse. The court answered this contention by saying:

"We have carefully examined the questions objected to, and considering the age of the prosecuting witness, the delicacy of the subject matter of the investigation, and the answers which the witness had already made to proper questioning, we conclude that the court did not abuse its discretion in the questions propounded by it, and counsel for the state. One of the questions objected to as asked by the court is: 'Did he have sexual intercourse with you at that time?' This question was asked after the witness had related the circumstances of the night of the 17th of December, as set out above, and had stated that appellant had pulled her off of the porch. She was asked by counsel for the state what occurred then, and answered: 'He got to do what he wanted to do.' It was then that the court asked the question above to which objection was made.

A young girl called to testify upon a charge of this nature, on public trial, might naturally be more or less embarrassed by the surroundings, and diffident in the presence of curious onlookers who usually crowd the courtroom during such trials. Therefore, she might be reluctant or unable to express and describe in blunt words the act constituting the offense. Hence it was not prejudicial error for

the court, after she had related the circumstances, to ask the direct questions as to whether appellant had sexual intercourse with her. The questions asked by the court were, no doubt, deemed necessary, under the circumstances, to determine whether or not the appellant actually had sexual intercourse with the prosecutrix. Since there had to be actual sexual connection to constitute the offense, it was necessarily doubtless to ask the witness the direct question: 'Did he put his privates in yours?' * * *''

See also *People v. White*, 269 *P*. 2*d* 19 (*Cal. D. Ct. App.* 1954), affirmed 43 *Cal.* 2*d* 740, 278 *P*. 2*d*. 9 (*Sup. Ct.* 1954), *certiorari* denied 350 *U. S.* 875, 76 *S. Ct.* 120, 100 *L. Ed.* 774 (1955), and *People v. Murphy*, 53 *Cal. App.* 474, 200 *P.* 484 (*D. Ct. App.* 1921).

■■ Defendant contends the trial judge abused his discretion by asking leading questions which counsel himself would not have been allowed to ask, but we think the record speaks to the contrary.

Then too, there appears to be little foundation, in any event, for the defendant's assertion that the judge discriminated between his own prerogatives and those of counsel. A trial judge has discretion to allow leading questions when they will best serve to illuminate the truth. This leeway frequently proves most serviceable in prosecutions for sex offenses where the delicate nature of the details of the crime would otherwise prevent the witness from making a full disclosure. Accordingly, many jurisdictions have recognized that rape and carnal abuse cases constitute a specific exception to the general rule against leading questions. *Stinson v. State*, *supra*; *People v. Murphy*, *supra*; *People v. White*, *supra*; *State v. Upton*, 65 *Ariz.* 93, 174 *P*. 2*d* 622 (*Sup. Ct.* 1946); *Buckley v. State*, 19 *Ala. App.* 508, 98 *So.* 362 (*Ct. App.* 1923); *State v. Coffman*, 360 *Mo.* 782, 230 *S. W.* 2*d* 761 (*Sup. Ct.* 1950); *State v. Davis*, 20 *Wash.* 2*d* 443, 147 *P.* 2*d* 940 (*Sup. Ct.* 1944). This is especially so where the witness is youthful. *E. g.*, *Meredith v. Commonwealth*, 265 *Ky.* 380, 96 *S. W.* 2*d* 1049 (*Ct. App.* 1936); *State v. Davis*, *supra*.

If in these situations the trial judge may rightfully permit leading questions by counsel, of course he may ask them

himself. Indeed, Wigmore goes so far as to state that a judge's questions may always, under any and all circumstances, be leading in form since the reason for the rule against such questions does not apply to the relationship between judge and witness. The judge is not a friendly attorney who seeks to instruct the witness or whom the witness will blindly follow. 3 *Wigmore, supra,* cited in *State v. Manno, supra.*

We find no merit in defendant's insistence that the trial judge prejudiced his case by repeating some of Betty's answers to questions and by some of his comments and remarks. Certainly, the judge was entitled to ask Roger whether he had recognized any of his assailants, and he was also well within his discretion in ordering George and Lester Riley to stand up as Betty identified them.

In his charge to the jury, the trial judge did not define in his own words the crime of rape but merely quoted fully the applicable statute, *N. J. S.* 2A:138-1, as follows:

"Any person who has carnal knowledge of a woman forcibly against her will, or while she is under the influence of any narcotic drug, or who, being of the age of 16 or over, unlawfully and carnally abuses a woman-child under the age of 12 years, with or without her consent, is guilty of a high misdemeanor \* \* \*; or who, being of the age of 16 or over, unlawfully and carnally abuses a woman-child of the age of 12 years or over, but under the age of 16 years, with or without her consent, is guilty of a high misdemeanor \* \* \*."

In *State v. Butler,* 27 *N. J.* 560, 595 (1958), we said:

"\* \* \* Accordingly, we hold the view that a mandatory duty exists on the part of the trial judge to instruct the jury as to the fundamental principles of law which control the case. Among such principles is the definition of a crime, the commission of which is basic to the prosecution against the defendant. And the duty is not affected by the failure of a party to request that it be discharged. Whether, in the absence of objection, such failure constitutes plain error, would depend upon the circumstances of the particular case."

No requests to charge in this regard were submitted by the defendant and no objection was taken to the charge of the court as made, but he now claims it was plain error

for the trial judge not to define more fully the crime of rape and, most particularly, the element of carnal knowledge. It is said a jury of laymen would not understand that "carnal knowledge" refers to actual penetration of the female sexual organ by the male sexual organ and that this might mislead them into returning a false verdict.

The instruction in question might well have been more complete, but, under the circumstances of this case, we do not regard its possible imperfections as constituting "plain error," defined in *State v. Corby*, 28 *N. J.* 106 (1958), to mean:

> "* * * legal impropriety affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result. *State v. Haines*, 18 *N. J.* 550, 565 (1955); *State v. Picciotti*, 12 *N. J.* 205, 211 (1953)."

It is undoubtedly true that almost every layman of mature years knows that the crime of rape entails sexual intercourse with a woman against her will. Sexual intercourse does not occur without penetration. Therefore, failure to define explicitly "carnal knowledge" cannot be regarded as an omission of overwhelming significance under these circumstances.

Even more important, there was no dispute at the trial over the factual issue of whether or not penetration had occurred. The medical evidence established incontrovertibly that Betty had had recent intercourse with someone. The theory of the defense was that she and Roger had engaged in the illicit act and had accused the Rileys of rape in order to cover their own dereliction. Under the facts *sub judice*, this theory is patently implausible.

The combined testimony of Roger, Betty and Thornton was, of course, completely incriminating. But aside from this, the Rileys' own testimony, the actions of the parties, and the physical facts themselves refute the postulated defense.

It is almost inconceivable that Betty and Roger would choose to go to the police and report a rape which never occurred in order to conceal their own sexual activities. No surer way of bringing to light what they allegedly hoped to conceal could have been devised.

Furthermore, the gynecological examination conducted on Betty revealed evidence of forcible entry. Her skirt was spotted with seminal stains and her underpants were bloody. She was extremely disheveled and had suffered severe facial injuries. Roger had also been beaten. A hair from a Negro was discovered in Betty's panties. The four men involved in the crime were Negroes. All this is hardly consistent with the idea that the only intercourse which occurred on February 26 was voluntary and between Betty and Roger.

Unquestionably, the jury was entitled to find that defendants' guilt had been proved beyond a reasonable doubt, and our study of the entire record leads us inescapably to the conclusion, contrary to the Appellate Division's decision, that there was nothing in the conduct of the trial judge which could legitimately be classified as improper or as prejudicial to the defendants' rights to a fair and impartial trial.

We reach this conclusion without passing upon the right of the Appellate Division to reverse Lester Riley's conviction of rape from which no appeal was ever taken.

The Appellate Division was correct in reversing George Riley's conviction of assault with intent to commit rape. The judgment of the Appellate Division is reversed, however, with respect to the rape and atrocious assault and battery counts. The trial court's judgment of conviction of atrocious assault and battery against George Riley and its judgments of conviction of rape against George Riley and Lester Riley are reinstated and affirmed.

*For reversal in part and affirmance in part*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*Opposed*—None.