67 N.J. Super. 365 (1960)
170 A.2d 430
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RALPH WESLEY PUCKETT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 15, 1960.
Decided April 4, 1960.
*366 Before Judges PRICE, SULLIVAN and FOLEY.
Mr. Ralph Wesley Puckett, defendant-appellant, pro se.
Mr. Brendan T. Byrne, Essex County Prosecutor, for plaintiff-respondent (Mr. Milton N. Diamond, of counsel and on the brief).
The opinion of the court was delivered by PRICE, S.J.A.D.
Defendant seeks to reverse his conviction in the County Court, Law Division, based on the verdict of a jury which found that on November 16, 1958 he unlawfully possessed narcotics in violation of the provisions of R.S. 24:18-4. Defendant contends that: (a) his conviction, as a disorderly person, entered on November 17, 1958 in the municipal court on his plea of guilty of being a user of narcotics in violation of N.J.S. 2A:170-8, barred his present conviction for possession of the drug; (b) his written confession of guilt of possessing narcotics, received in evidence at the trial of the instant case, was the product of coercion and its admission therefore constituted prejudicial error; (c) his conviction was against the weight of the evidence; (d) his counsel made an unwarranted and prejudicial concession at trial; and (e) two persons (he *367 and one Milton L. Sims, arrested with him under the circumstances hereinafter outlined) cannot legally be convicted of possessing the same narcotic specimen.
The factual situation revealed by the record is that, on November 16, 1958 at 6:40 P.M., a state trooper, Herder, stopped defendant who was then driving his car in Newark in a southerly direction on the New Jersey Turnpike. Sims was in the automobile at the time. Two other members of the state police arrived promptly and Puckett and Sims were taken to a police station and the car searched. Under a floor mat on the driver's side of the car was found a cellophane packet containing a white powder later diagnosed as heroin. Some hypodermic needles, a syringe, a charred teaspoon, a headache powder and four or five empty bottles labelled paregoric were also found in the car.
Statements were taken from Puckett and Sims and were typewritten and signed the same evening. The statement, concededly signed by defendant and admitted in evidence over his objection, was as follows:
"Statement of: Ralph Wesley Puckett, 1595 Beecher St., Atlanta, Ga.  W-M-30
Taken at: N.J. State Police Station, Turnpike, Newark, N.J.
Time & Date: 10:50 P.M., Sunday, Nov. 16, 1958  E.S.T.
Questioned: Det. 2/c V. Galassi and Inv. T. Tyrrell #970, N.J. State Police.
Witness: Tpr. C. Herder #1369, S.P., Newark, N.J.
Q. Ralph Wesley Puckett, I am Inv. Tyrrell and this is Det. Galassi, both of us members of the N.J. State Police. It is our duty to ask you some questions with regard to the circumstances surrounding the apprehension of you on the N.J. Turnpike, Newark, Essex County, N.J., this date, while operating a 1951 Pontiac sedan, reg. 1-95121-Ga., in which was found a packet containing a white powder, appearing to be heroin, by Tpr. Herder. I tell you at this time that whatever you say must be entirely on your part and without the use of force, fear, threat or promise of (sic) lienency [sic] on our part. I further tell you that anything you say can and may be used for or against you or any other person or persons in a criminal prosecution. Ralph Wesley Puckett, are *368 you willing to make a statement under the conditions (sic) outline [sic] above? A. Yes.
Q. What is your full name, age and address? A. Ralph Wesley Puckett, 1595 Beecher St., Atlanta, Ga. Thirty.
Q. Will you now tell me, in your own words, what happened? A. Sims and myself left Florida about Sunday and drove (sic) thru [sic] to New York. Arrived in New York last night. And was looking to buy some heroin because he was sick from using paregoric. We saw two men who looked like junkies and I asked them did they know where we could score for some heroin. We went and copped. We fixed that and scored the following day for enough stuff to last us two or three days and was headed out of New York City and were stopped on the turnpike.
Q. Who owns the car which you were driving? A. I do.
Q. Will you describe this car? A. '51 Pontiac, two tone light grey, Georgia registration.
Q. (Det. Galassi) I show you a package containing white powder which was found under the floor mat on the driver's side of the car you were operating and I ask you is this the package you bought in New York City? A. Yes.
Q. How much did you pay for this package A. One hundred and eighty dollars.
Q. How much of the one hundred and eighty dollars did you pay? A. I paid ninety of it.
Q. Did you shoot any of the heroin for which you paid $180.00? A. Yes, I took one shot.
Q. Do you have anything further to tell me? A. I think that about covers it.
Q. Will you now read this statement, consisting of two typewritten pages, and if it is true and correct to the best of your knowledge and belief, will you sign it? A. Yes.
 Witness Victor T. Galassi
 Witness T.P. Tyrrell
 Witness Tpr. Charles R. Herder
 Signature: Ralph W. Puckett
 Completed at 11:35 P.M., Nov. 16, 1958."
The three members of the state police who were present at the taking of the statement, Detective Galassi, Investigator Tyrrell and Trooper Herder, testified that defendant's story as it appeared in the statement was recorded directly on the typewriter as he was being interrogated. The chief chemist and toxicologist for the New Jersey State Police, John P. Brady, to whom the package found in the car had been given for analysis, testified that the specimen "had *369 6.310 grams of total weight of drug of which 9 and 1/2 percent was heroin or diacetyl morphine * * *"; that the specimen was "a direct derivative of the poppy and a narcotic drug."
We initially consider appellant's contention that, in view of his aforesaid prior conviction for violating N.J.S. 2A:170-8, his indictment and prosecution under R.S. 24:18-4 placed him in double jeopardy. The essential difference between the crimes specified in the respective statutes was noted in State v. Cruz, 15 N.J. Super. 577 (Cty. Ct. 1951), in which the court rejected the precise contention defendant makes in the case at bar. Defendant relies on State v. Labato, 7 N.J. 137 (1951), but its inapplicability to the issue was specifically determined in Cruz, supra. Judge Hartshorne there said (15 N.J. Super., at pp. 579-580):
"Defendants claim that under State v. Labato, 7 N.J. 137 (1951), by reason of above convictions as disorderly persons, the present accusations place them in double jeopardy, contrary to the provisions of the New Jersey Constitution, Art. I, par. 11, and the somewhat broader common law principle. More specifically, they argue that since to be a drug addict one must have had possession of the drug to which he is addicted, their possession of the heroin July 18, on which the present accusations are admittedly based, is an essential ingredient of the disorderly persons offense of which they have previously been convicted.
But this contention indicates a misunderstanding both of the facts underlying their previous conviction and of the principle enunciated in State v. Labato. As our highest court itself states in such case: `The true test of former jeopardy would seem to be whether the evidence necessary to sustain the second indictment would have been sufficient to secure a legal conviction on the first.' (Ibid., 7 N.J., at p. 144.)
Here the evidence necessary to sustain the present (second) accusation is the possession of the heroin on July 18. But this evidence obviously would not `have been sufficient to secure a legal conviction on the first' charge. For the charge of being a drug addict depends not on a single, simple, possession of narcotics, whether legal or illegal, but upon the habitual use of narcotics. Clearly the facts on which the State relied on the disorderly persons charge was not the single possession on July 18, but the written confessions by the defendants as to their habitual use of narcotics *370 previously. Obviously these facts alone can have induced defendants to plead guilty to such charge.
Thus, in fact, `the evidence necessary to sustain the second (i.e., the instant) indictment' may well not have been at all pertinent to the first conviction. Certainly it did not suffice to sustain such conviction. Far different is the present situation, where one prosecution is based on possession, the other on habitual use, from the situation in the Labato case where `the two prosecutions concern the one supposed act of possession.'"
Cf. State v. McFadden, 32 N.J. Super. 258, 260 (App. Div. 1954); State v. Campisi, 47 N.J. Super. 455 (App. Div. 1957). In the latter case, in reviewing the legality of defendant's conviction for the unlawful possession of a narcotic drug, we noted (at p. 457) that the defendant challenged "the admission of evidence * * * of alleged unlawful use of narcotics on his part, insisting that the admission of such evidence, tending to prove a separate criminal offense, was erroneous and prejudicial * * *." (Emphasis supplied) In approving the trial court's charge, outlining the limited significance of the evidence of defendant's use of narcotics as bearing on the charge of possession, we recognized (at p. 459) that two separate and distinct offenses were involved.
In State v. Hoag, 35 N.J. Super. 555 (App. Div. 1955), affirmed 21 N.J. 496 (1956); 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958), Judge Jayne (35 N.J. Super., at pp. 558-560) marshalled the decisions in our jurisdiction concerning the subject of former jeopardy and, in addition to the test specified in Cruz, supra, outlined other controlling factors. After noting, at p. 559, that in considering former jeopardy we are primarily concerned with "whether the act was inherently and in substance and character the identical offense for the commission of which the defendant had been previously tried," and, after further noting the variety of circumstances under which the issue arises, he stated (at p. 560):
"* * * In our jurisdiction the recognized test of former jeopardy is whether the evidence necessary to sustain the second *371 indictment would have been sufficient to secure a legal conviction on the first, unless there has been a prior acquittal or conviction of a greater offense which was inclusive of the lesser offense sought to be subsequently prosecuted. * * *"
In affirming the decision in the last cited case, Mr. Justice Wachenfeld, speaking for our Supreme Court, also noted that the issue of double jeopardy "has arisen in many contexts" and again recognized (at 21 N.J. pp. 502-503) the applicable tests of the "single act" and the "same evidence" norms.
Appellant relies on State v. Hill, 44 N.J. Super. 110 (App. Div. 1957), but it clearly has no application to the situation in the case at bar. In the cited case defendant was indicted on two counts. The first count charged him with robbery in violation of N.J.S. 2A:141-1; the second alleged an assault with intent to rob in violation of N.J.S. 2A:90-2. Both accusations grew out of the same transaction. The jury returned a verdict of guilty and the court imposed separate sentences on each count. The court held (at p. 112) that on the facts there shown it was obvious that "there was but one criminal transaction and that the facts which proved the robbery were the same as those to be relied upon to prove the assault with intent to rob." The court held that the test to be applied in deciding the issue of merger is whether a particular act involved in a single transaction is a distinct criminal affair or an integral part of the principal offense charged. The court stated (at p. 112): "Plainly the lesser offense was a component part of the greater and a merger of the two arose upon conviction of the latter." The court added (at p. 113) that the record showed "the commission of a robbery as the end result of a single criminal transaction. That robbery contained within it, as a step in the path to its perpetration, the offense of assault with intent to rob." To the same effect see State v. Riley, 28 N.J. 188 (1958), where the court held (at p. 195) that where a lesser crime is a constituent element of a greater crime, which embodies but one *372 criminal transaction, "the liability for that offense may not be fractionalized according to its component parts."
Tested by the above principles it is clear that Puckett's conviction, based on his plea of guilty to the charge that he was a user of narcotics, is for an offense separate and distinct from the charge that on November 16, 1958 he was the possessor of heroin found in his automobile then being operated by him as aforesaid. His plea of double jeopardy is without substance.
We next turn to defendant's claim that his aforesaid confession was not voluntary and was therefore improperly admitted as an exhibit.
The standard to be applied in testing the propriety of a trial court's admission of a defendant's "confession" was stated as follows in State v. Wise, 19 N.J. 59, 78-79 (1955):
"The basic rule as to the admissibility of confessions has been written many times. The primary inquiry in determining its admissibility is whether or not it was voluntary. Whether it was voluntary depends upon the facts in each case.
Its competency is primarily for the trial judge, while the weight to be given it is determined by the jury. The determination of the trial court will not ordinarily be disturbed on appeal where there is sufficient evidence to support it."
See also State v. Rios, 17 N.J. 572, 600 (1955).
Defendant testified that, at the time the statement was taken, he did not comprehend its significance, he was ill, was experiencing a "withdrawal" from the effect of narcotics and was induced to affix his signature to the statement on the promise of a "fix" (defined by the trooper as "a shot of a narcotic, usually referred to as heroin"). Defendant's own testimony was the principal basis upon which he challenged the admissibility of the confession.
Puckett testified that he "vaguely" recalled being asked to sign the statement; that he did so "not under my own free will." He said: "I read some parts" of the statement. He stated that he was unable to read "all of it," because of a "severe headache" and because "I couldn't focus my eyes *373 too well." He added that he was "nauseated" at the time; that his legs were "pulling and twitching"; that he was alternately hot and cold; that one hand was "handcuffed to the chair"; that at about 11:00 P.M., before he signed the statement, while he was feeling "terribly sick" and had so told the officers who were interrogating him, one of them, Investigator Tyrrell, promised to take him and Sims to a doctor who "would give us a shot that night"; that the investigator told him "I'll take you to the doctor and tomorrow afternoon * * * I'll bring you a shot myself. * * * After that you'll have to try to make it on your own"; that he had used paregoric orally and also injected it; that he had had a shot that afternoon, "consisting of one ounce," and that there was "smut on the boiler" he had used to "cook it with." He denied that he took heroin. On cross-examination he repudiated that portion of his "confession" in which he had stated that he had bought the aforesaid package of heroin or that he "had any money invested in it" and said that the presence of those statements in the confession was the basis of his protest against signing it; that before he signed the statement Trooper Herder, who had arrested him, "had me by the collar, the neck."
Trooper Herder denied that he had threatened defendant or that he had grabbed him by the collar. He testified that he was present during the entire time defendant was giving his statement; that defendant was "oriented to his surroundings" and appeared to "comprehend the questions" asked and the "nature of the answers he gave"; that no promises to induce defendant to sign the statement, by promising him a "fix" or to take him to a doctor, were made; that defendant, although appearing tired, exhibited no symptoms of illness and made no complaint that he felt ill.
Investigator Tyrrell testified that no threats or promises were made to induce defendant to sign the aforesaid statement, that he appeared oriented and to comprehend the *374 nature of the questions propounded. He denied that defendant was in "agony" as suggested by defendant's counsel on cross-examination or that defendant made any complaint of headache or that his "bones were aching him" or that defendant's muscles were "twitching."
Detective Galassi identified the aforesaid package which he had received from the trooper and which he had delivered to the police laboratory for analysis. He testified that he had been engaged in narcotics work for seven years and was familiar with "withdrawal" symptoms exhibited by a narcotics user; that some or all symptoms displayed on such occasion are "a running nose, runny eyes, terrific stomach cramps, vomiting, nauseous [sic] or even in severe cases maybe diarrhea"; that Puckett manifested none of those symptoms.
A police surgeon of the City of Newark who examined defendant on November 17, at about noon, said that defendant then appeared calm and his eyes and nose were normal. The doctor testified that defendant told him that he had taken heroin by injection on November 15 and 16; that he had been using opium since November 1957; and that he had been taking 12 to 15 ounces of paregoric daily. The doctor expressed the opinion that, assuming defendant had taken "a shot of heroin" at about 6:00 P.M. on November 16, he would still be oriented and could comprehend and respond to questions propounded to him between 10:00 P.M. and midnight of that day. He said that conditions observed by a detective, who testified that at 9:00 A.M. on November 17 defendant's nose was then "running," his eyes "tearing" and he had chills, could have "worn off" by the time the doctor examined him. On this record the action of the trial court, admitting the confession into evidence, was clearly within his sound discretion and under well settled principles should not be disturbed as there was ample evidence to support it.
Defendant next contends that the verdict was against the weight of the evidence. In addition to the aforesaid proofs *375 the record shows that Sims, testifying on behalf of the defendant, said that on November 10, 1958 he and defendant had left Miami, Florida for New York City, in defendant's car; that he had purchased the package of heroin in question without the knowledge of defendant; that he had paid $180 for it; that he was presently serving a prison sentence as the result of his conviction for possessing the heroin in question. He further testified that on November 16, after leaving New York City in defendant's car, they had stopped at a gasoline station near the New Jersey terminus of the George Washington Bridge; that defendant had there left the car momentarily and while he was absent Sims had placed the package of heroin under the floor mat on the driver's side of the automobile; that he did so without defendant's knowledge. He further stated that although he had known defendant for several years he never knew him to use heroin; that the witness had seen defendant take paregoric orally and by injection but that the hypodermic needles found in the car belonged to the witness.
Under cross-examination it developed that Sims had given a statement to the police on the evening of November 16. The statement was received in evidence by consent and that statement contained the comment that he had given Puckett $100 of the total of $180 to "help buy some" heroin, and again referring to the purchase of heroin Sims' statement contains the words "we bought it." He contended that the statement had been taken from him at a time when he was ill and handcuffed to a chair in police headquarters; that he did not recall whether he had read the statement and that he was in a sick condition because he was undergoing a "withdrawal from heroin" and was in need of "a fix"; that his nose was running, he was vomiting, he had cramps and his joints ached; that the troopers could look at him and observe that he was sick; that he was beaten and later was promised "a fix" if he would sign the statement. He admitted that he had previously been convicted *376 of crime. The members of the state police force who took his statement denied that he appeared sick and further specifically denied that they had threatened him or promised him anything. Dr. Brady, the toxicologist, stated that if paregoric were "shot as a main liner" into a vein, death would result. It is clear that there was ample evidence to sustain the verdict of guilty returned by the jury.
Defendant criticizes the following remark, made by his counsel during summation:
"* * * if you have a reasonable doubt in your mind, give that doubt to him. Let him benefit by it and I'm sure that if you do that you will have to come to one conclusion and that is that he is not guilty and knew nothing about how it got into the car; although I must say that he probably had knowledge of the fact that Sims did purchase it." (Emphasis added)
Apart from the lack of any justification for defendant's reference to the above remark by his own counsel as a basis for voiding his conviction (for which he offers no authority), we note that in his brief defendant recognizes that, in making the above quoted statement, his counsel was "trying to help him." The only asserted basis for his criticism of the remark is that he [defendant] "did not tell counsel that he had knowledge of any purchase" made by Sims. We fail to see any prejudice to defendant in the criticized remark. It was a frank statement by his counsel in the face of damaging evidence, to stress the single issue of possession. It still left counsel free to emphasize, as he did, the denial by defendant that he actually possessed the heroin at the time the car was stopped by the police.
Defendant finally contends that he and Sims could not contemporaneously possess the same packet of heroin; that, as Sims had already been adjudged guilty of possessing it, defendant's conviction must be set aside. This contention ignores the fact that there may be joint possession of a single article. The conviction of defendant is affirmed.